OVERTON, J.
 

 These consolidated cases are suits on the double indemnity clause, contained in each of two life insurance policies, written by defendant on the life 'of Joseph P. Cormier, payable, one to his wife, and the other to his minor children, all of whom are plaintiffs herein. Each policy is for $5,000, and therefore the double indemnity feature in each is for $5,000. There is also a demand for $175 interest in each of the two cases, which rests upon the allegation that in an amicable settlement of the $5,000, representing the face of the policy, and payable without reference to death by accidental means, there was a failure to pay the interest between the date of the proof of death and the date of the settlement.
 

 The double indemnity clause reads as follows:
 

 “Upon receipt of due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause, and that such death occurred within ninety days after sustaining-such injury,,subject to all the terms and conditions contained in Section 2 hereof.”
 

 The conditions contained in section 2 are as follows:
 

 “The provisions for double indemnity benefit on the first page hereof will not apply if the insured’s death resulted from self-destruction, whether sane or insane; from any vio
 
 *361
 
 lation of the law by the insured; from military or naval service in time of war; from engaging in riot or insurrection; from war or any act incident thereto; from engaging as a passenger or otherwise, in submarine or' aeronautic operations; or directly or indirectly from physical or mental infirmity, illness or disease of any kind.”
 

 The defenses are: First, that the death of the insured does not come within the double indemnity clause ,of the policy, in that it was not brought about by accidental cause; and, secondly, because his death resulted from a violation of law, in that the insured carried a concealed weapon, namely, a pistol, and was the aggressor, firing to kill a person — all violations of the law.
 

 The death of the insured occurred in the neighborhood of 11 o’clock in the morning, while an election was in progress at the Plaqucmine Point precinct in the parish of St. Landry. On that occasion a rencounter occurred in which the insured, John Childs, and Thomas Childs were killed and Getty Childs, Joseph Castille, and two others who took no part in the affair, were wounded, Getty Childs seriously.
 

 Approximately one year prior to the death of the insured, while the latter’s employees were working the public road opposite his place, Thomas Childs, the son of John .Childs, threatened to kill him, if the employee continued to work the roard, adding that the insured was no more than the employee, when informed that the latter was working the road at the insured’s instance. The conduct of Childs was communicated to the insured.
 

 On another occasion, some five or six months before the death of the insured, Thomas Thibodeaux saw the handle of a pistol, borne by Thomas Childs, and asked Childs why he was carrying it, and Childs replied that the insured hit him when he was a child, and' that he wanted revenge some day.
 

 Seventeen days before the death of the insured, while he was in conversation with Eli Beaugh in a store at Lawtell, Thomas Childs walked up to him and kicked him, and when the insured asked what he meant, Childs replied: “You remember when you hit me when I was a kid, now I am a man like you.” A fight immediately followed in which both the insured and Childs used knives. Immediately after the fight began, John Childs, the father of Thomas Childs, joined his son in the' fight. The result of the fight was that the insured received five knife wounds, at least one of which was inflicted by John Childs. After the fight had ended, and while the insured was about to be taken to the hospital, Thomas Childs exclaimed, in the presence of the accused, that he had been waiting a long time for this, and that he was a man then and if anybody wanted' to take the insured’s side he was ready.
 

 One witness testified that, at the house of Thomas Childs, shortly before the latter left for the polling precinct with Getty and John Childs, Thomas Childs exhibited to him the gaps in his knife, which he said were made in cutting Cormier, and that a few minutes later, Thomas Childs remarked to his father, jokingly, that he wanted to make friends with the insured, at which his father grew angry and replied: “Tom, no; you don’t have to make friends with him; the thing you ought to do is to put a ball through him, because as soon as he sees us arrive, he will (substantially) be scared to death.” The evidence of this witness, for reasons which will hereafter appear, does not appeal strongly to this court.
 

 A few minutes after the foregoing remarks were said to have been made, the three Childses left in an automobile for the poll
 
 *363
 
 ing place, which was a short distance away. As appears from later disclosures, it appears that, at .the time of leaving, Thomas and Getty Ohilds were armed with pistols, each carrying his pistol, strapped to his waist, and concealed under his shirt, both being in their shirt sleeves, but so far as relates to John Ohilds, there is no evidence whatever that he was armed then or at the time of the 1 rouble that ensued.
 

 John Ohilds was appointed one of the commissioners of election, but he failed to appear. It is said by his son, Getty Childs, (hat his father declined the appointment, because he wished no trouble at the polls. The insured was not originally appointed a commissioner of election, but was appointed by the commissioners present to take the place of some one absent, probably the place of John Childs, and served as such. Ho went to the polls early in the morning.
 

 The election was held in a garage, which consisted of three rooms, and was located near the public road. One of these rooms was used as a booth in which to mark tickets. The commissioners sat in the room next to it. To this room were two large double doors, affording 'an entrance from the outside. To prevent people from crowding the voting place, the commissioners stretched a rope so as to block off a square in front of the garage, extending some twenty or twenty-five feet from the building.' An opening was left at the extreme right, next to the building, so arranged that the opening of the right-hand door of the garage would close the opening, and tend to prevent others from coming into the inclosure. In the room in which the commissioners were placed was a long table upon which the ballot box and ballots were put, the ballots being near the middle of the table and the ballot box near one end of it, which end does not appear.
 

 At the time the Childses arrived, the insured was standing at the right end of the table, when one faces the building. The Childses, on arriving, walked towards the polling place, which was a few yards distant from the road. On reaching the rope, John Childs, instead of going through the opening left in it for that purpose, stepped over the rope, walking at a fair gait, Thomas following him some eight or ten feet behind, both walking towards the ballot box in the direction of, and facing, the insured, Getty remaining outside of the rope, he says, to prevent crowding the polls.
 

 As John Childs passed a friend, just after stepping over the rope, he bade his friend good morning, and passing on reached a point within four or five feet of the insured, when the insured, drawing a pistol, apparently from his bosom, shot him; the ball entering at the junction of the nose and forehead. John Childs fell dead. Thomas Childs, while following his father, was seen to put his hand in the bosom of his shirt, immediately before the shot was fired, and when his father fell, which was some four or five feet ahead of him. he had his pistol pointed at the insured, and he and the insured began firing at each other ; the first shot by each being fired about the same time. After the shooting had continued for a moment or two, Thomas Childs fell dead by his father’s side, his pistol by his side, and the insured stepped up to the table, laid his pistol on it* and exclaimed that he was shot to death, and fell into the arms of a friend. He died some twenty-five minutes later. While the shooting was in progress, Joseph Castille, a tenant of the insured, who went to the polls armed with him, and Getty Childs, began firing at each other, on the outside of the rope; the latter falling seriously wounded, and the former also receiving a wound.
 

 
 *365
 
 It is well established that where the insured is intentionally injured by another, and the injury is not the result of misconduct or an assault by the insured, but is un- ' foreseen, in so far as he is concerned, the injury is accidental within the meaning of an accident policy, insuring one against injury through external, violent, and accidental cause. See authorities cited in annotation to Employers’ Indemnity Corporation v. Grant, 20 A. L. R. 1123.
 

 In the ease before us it is urged by plaintiffs that the insured was killed while acting in self-defense, and therefore that his death was occasioned by accidental cause within the meaning of the policies. We find, however, that he was not acting in self-defense, but that, when the facts are analyzed, it appears that he was, in reality, the aggres.sor in the difficulty on the day he met his death. To constitute self-defense, in a homicide case, there must be an actual attack, hostile demonstration, or overt act of such nature as to afford reasonable ground for the belief that the subject of the attack or demon.stration is in danger of losing his life or of .receiving great bodily harm, and that the killing of the person making the attack or .hostile demonstration is necessary to avert the •danger. State v. Williams, 129 La. 795, 56 .So. 891. Prior difficulties and threats do not, of themselves, justify the taking of human life. They may serve only to indicate and explain the nature and seeming danger of the attack or overt act.
 

 When John Childs walked towards the table, containing the ballots and ballot box, in the direction of the insured, ostensibly for the purpose of voting, he made no overt act against him, but nevertheless was shot and Idlled by the insured, without even the uttering of a word by either.
 

 John Childs and his two sons, to the knowledge of the insured, had a right to go to the polls that day to vote, and, in order to vote, they, or any one of them who desired to do so, had to walk to the table, which meant walking in the direction of, or towards, the insured, who was at the table as a commissioner, filling the place of another. There was nothing-unusual in John and Thomas Childs, in these circumstances, walking towards the table, where the insured was standing, which may be looked upon as an overt act, nor was there anything in it which may be regarded as such an act when the situation is viewed in connection with the fact that John and Thomas Childs stepped over the rope barrier, which was only about waist high, instead of walking to the extreme right, and going through the opening left for entrance. There is nothing extraordinary, in a person, who has a legal right to enter an enclosure, stopping over such a barrier, instead of going around to enter, or even in walking at a fair gate when he does enter. Hence, we say that John Childs was shot and killed without any overt act being made at the time on his part:
 

 But it is argued that Thomas Childs was following behind his father, concealed there, as it were, with the end in view of killing the insured, and that the three Childses went to the polls that day with that end in view. Thomas Childs was walking a few feet behind his father, but that, of itself, presents nothing suspicious. It is most unlikely that, if an attack was contemplated on the insured, Thomas would have used his father, who was seventy years old, and, so far as appears, unarmed, as a screen, thereby exposing him. in the event of resistance, to death.
 

 It is true that Thomas Childs was armed, and it is said that he and his brother usually went armed,, and it is likewise true that, on
 
 *367
 
 that morning, he drew and used his pistol. The exact second at which he proceeded to draw it with reference to the drawing by the insured of his weapon does not clearly appear from the direct evidence, but we think that circumstances, in connection with the direct evidence, show this fact.
 

 It is beyond dispute that the first shot on that morning was fired by the insured at John Childs. About the time Thomas Childs passed one of the important witnesses in the case, this witness saw him put his hand in the bosom of his shirt, and about the same time heard a shot fired, which, obviously, was the first shot fired that morning. One or two other witnesses testify that they saw Thomas Childs put his hand in his bosom before a shot was fired, but how long before does not appear. lie could not very well have begun to draw his pistol at the time the first shot was fired, for when his father fell he had his pistol pointed >at the insured. He evidently started the drawing of it immediately after the insured started drawing his, and therefore was unable to shoot before he did, for mere human impulse would have caused him to fire at the first opportunity to protect his father.
 

 The evidence adduced of prior threats and difficulties adds no 'strength to plaintiffs’ case in the absence of an overt act at the time of the homicide. Without' such act there is 'nothing for them to add to or explain. So far as relates to the remarks, testified to by one witness as made by John and Thomas Childs, in his presence, a few minutes before they left to vote, the court finds itself unable to give credence to the evidence as to these remarks. The witness testifies that the remarks were made after dinner, he having dined that day with the Childses, when the evidence shows that the Childses left to vote about half past 10 in the morning, and that John and Thomas were killed about 11 o’clock that morning. Moreover, evidence of statements, made by men who have since died, is the weakest kind of evidence, and when it fails otherwise to impress the court, it ought not to be given weight.
 

 Our conclusion is that the insured was^ the aggressor and by his own act precipitated the difficulty which resulted in his death. Therefore, his beneficiaries cannot successfully urge that, within the meaning of the policies, the insured’s death was brought about by accidental cause.
 

 As to plaintiffs’ demand for the interest on the $5,000, constituting the face of each policy, amounting to $175 in each suit, the only information that the record discloses concerning it is what the pleadings of the parties show. Proof of death was filed on November 14, 1924. On July 20, 1925, plaintiffs received from defendant, through an amicable agreement, the $5,000 representing the face amount of each policy, without waiver of the rights of any party, and especially without such waiver either to claim or resist the double indemnity. The trial judge does not mention the interest in his judgment nor in the reasons therefor. Plaintiffs have asked us in their answer to the appeal to allow it. No just cause appearing why it should not be paid, and it being well within the amount allowed by law, and in view of the reservation as to rights made by both sides, it is allowed. See Act No. 17 of 1920. However, we think that defendant should not be cast for the costs of the lower court because of the allowance of the interest, for the record was not built up on that demand. That demand added nothing to the costs.
 

 For these reasons, the judgments appealed from are set aside, and judgment is now ren
 
 *369
 
 dered, rejecting plaintiffs’ demands, based upon the accident clause in each ease, but allowing the $175 interest claimed in each of the two consolidated cases; plaintiffs to pay the costs of both courts.