168 So. 761

## CUTITTO v. METROPOLITAN LIFE INS. CO.

No. 33689.

May 25, 1936.

Spencer, Gidiere, Phelps & Dunbar, of New Orleans, for appellant.

Edward M. Robbert and Michel Musson, both of New Orleans, for appellee.

LAND, Justice.

On the night of December 24, 1932, at or about 10 o'clock, Paul Petta was shot and killed at his residence, No. 2510 Frenchmen street, in the city of New Orleans, by Mrs. Ella Landry Simoneaux.

Plaintiff, Mrs. Anna Cutitto, the surviving widow of deceased, was made beneficiary in two policies of insurance on his life, each for the sum of $5,000, issued to him by defendant company.

After collecting and receiving the amount of insurance provided for in each of these

policies, plaintiff seeks in the present suit to recover, in addition thereto, the further sum of $10,000, provided for in supplemental agreements to the policies, and made payable in the event of death *from accident* within 60 days after injury.

It is provided in each of these supplemental agreements that: "The indemnity provided for herein shall be payable only if the death of the Insured result in consequence of bodily injury effected solely through external, violent and accidental means, within sixty days after such injury, independently and exclusively of all other causes."

The district court gave judgment for plaintiff in the sum of $10,000, with interest thereon at the rate of 5 per cent. per annum from the 28th day of December, 1933, until paid, together with all costs incurred by plaintiff in this proceeding.

From this judgment defendant company has appealed, and plaintiff has answered the appeal, and prays that the judgment appealed from be affirmed, and that appellant be condemned to pay the cost incurred in both courts.

1. The evidence in the case shows, unquestionably, that Paul Petta was killed by Mrs. Ella Landry Simoneaux at his residence in the city of New Orleans at or about 10 o'clock on the night of December 24, 1932.

The special defense urged by the insurance company is: "That the assured, Paul Petta, met his death on the night of December 24, 1932, at the hands of Mrs. Ella Landry Simoneaux, in the course and as the result of an affray or quarrel in which the assured, Paul Petta, cursed and abused Mrs. Ella Landry Simoneaux on that night and at the same time *searched in the room,* in which the parties were at the time, *for a pistol with which to shoot* her, and told Mrs. Simoneaux that *he was about to shoot her,* and advanced upon her and put her *in fear of her life,* whereupon Mrs. Simoneaux, *in self-defense, shot the assured Paul Petta."* (Italics ours.)

Defendant company alleges, therefore, that the death of the late Paul Petta was not *an accidental death* and was not due in any sense to *accidental means.*

On the other hand, as said by this court in Franchebois v. New York Life Insurance Company, 171 La. 358, 365, 131 So. 46, 48: "It is well established that where the insured is intentionally injured by another, and the injury is not the result of misconduct or an assault by the insured, but is unforeseen, in so far as he is concerned, *the injury is accidental* within the meaning of an accident policy, insuring one against injury through external, violent, and accidental cause. See authorities cited in annotation to Employers' Indemnity Corporation v. Grant, 20 A.L.R. 1123." (Italics ours.)

There were no eyewitnesses to the homicide. Immediately after the shooting Mrs. Simoneaux telephoned the Fifth Precinct Station in the city of New Orleans, stating that she had killed Paul Petta. Sergeant William Hazard, Jr., who was on duty at the station, directed Officer Thomas Paton to proceed to the neighborhood of Dorgenois and Frenchmen streets, and, upon arriv-

ing at an oil station, found Mrs. Simoneaux on the premises. After telling the officer at the oil station that she "shot a man and thought he was dead," she conducted the officer across the street to the scene of the shooting, No. 2510 Frenchmen street. The officer found the front door blocked, and, upon pushing it open, discovered the body of Paul Petta lying on the floor. Tr. pp. 37, 42.

Patrolman Edward Hughes was with Officer Paton at the oil station at the time Mrs. Simoneaux admitted that she had shot the insured, Paul Petta. Tr. 40.

Officer Henry Tedesco arrived at the scene of the shooting and found several policemen conducting an investigation. He was ordered to take the body of Petta to the morgue. Tr. 49.

Officer Thomas Paton testified that, when they opened the door of the front room to go in, the door half opened and was stopped by the body of Paul Petta, which was lying on its back, with the head two feet from the corner of the front room, about a foot or two from the door, and that the legs of the body stopped the door from opening all the way. Tr. pp. 36, 37, 39.

The officer also stated that deceased was fully dressed, with the exception of a coat; that he had on a vest, which was open. Tr. 39.

The officer also observed a chair with a cushion by the door leading into the room *behind* the front room, and also a settee about 4½ or 5 feet long, just as you get inside of the door. Tr. 38.

The body of Petta was not found *near* the chair with the cushion at the door of the room *behind* the front room, with the settee just inside the door; but was found at the *front* door of the *front* room, the legs partially jamming that door.

Deceased had no weapons upon or near his body. A .32 caliber Smith & Wesson pistol was found by the officers on the table *in the middle* of the front room. It is not possible that deceased could have placed this pistol on the table, since Mrs. Simoneaux admits that she had the pistol in her possession at the time of the shooting, and did the shooting with this identical weapon.

The coroner of the parish of Orleans performed an autopsy, and assigned as the cause of death "hemorrhage and shock following multiple gun shot wounds," described as follows:

"Bullet No. 1—*entered back of head* two inches to left of post median line on line with occipital proturbance, *passing forward thru brain* and lost in the muscles of the cheek.

"Bullet No. 2—*entered left side of chest* between the 1st and 2nd ribs, 2" to the left of the anterior median line, *passing through left lung, arch of aorta, right lung,* and lost in muscles of the chest.

"Bullet No. 3—entered left chest between 2nd and 3rd interspace in line with the nipple, passing backward and to the right, *passing thru left lung, auricle of the heart, right lung,* found under skin at the right posterior angle of the scapular.

"Bullet No. 4—entered the abdomen three inches to the left of the midline, one inch

below the ensiform cartiledge, passing backward and slightly to the right, traversing the stomach, small intestines and lost in the muscles of the back." (Italics ours.)

Mrs. Simoneaux has made several conflicting depositions as to how the killing occurred. One of these depositions was made before J. B. Dudley, notary, March 21, 1935, and the other was made before Nettie Etheridge, notary, April 11, 1935.

In the first depositions of March 21, 1935, Mrs. Simoneaux testified: "Him and I was *wrestling and struggling* and I was trying to save myself * * * *we were both struggling* * * * *well, if he was struggling with me, I was struggling with him, and that is how it happened.*" Answer to interrogatories 14–16. (Italics ours.)

In the second depositions of April 11, 1935, or about three weeks after the first depositions, there is no mention of "a struggle" whatever.

In answering interrogatory 4, section H, Mrs. Simoneaux said: "When he came in an argument started and he told me *to leave the house,* if I didn't he was going to get a policeman to get me out, and during the argument he pulled off his coat and said he was going to kill me, *and he looked for a gun,* and I happened to sit *on the sofa in the parlor and I felt the gun and took it out from the cushion, and then I put it in my bosom,* and he was looking under the mattress, in drawers, opened them up, *and when he approached me and said he was going to kill me I just pulled the gun out and shot in self-defense.*" (Italics ours.)

In her first depositions Mrs. Simoneaux stated: "The pistol was sitting on the *sofa chair* by the door, and I didn't know it was there when we was having the fuss, and he made an attempt to come to me and I happened to discover the pistol."

As already stated, *the sofa chair* was at the door of the second room *behind* the front room, in which the shooting took place, and *the sofa* was just inside the door of this second room.

If Petta had placed the pistol under the cover of the sofa chair or of the sofa, he would have known where to find it, and would not have looked under the mattress and in the drawers and opened them in his search for the weapon.

In her last depositions before Nettie Etheridge, notary, on April 11, 1935, Mrs. Simoneaux stated that *about* 12:30 of the day she killed Petta he told her "the best thing for me to do *was to get out the house; that she left* the premises to go to her sister's *and returned at 5:30 o'clock that evening;* that *Petta was not at home* when she returned; that he came in about *10:00 o'clock.*" (Italics ours.)

Mrs. Simoneaux does not pretend, when Petta told her to leave at 12:30 of the day of the killing, that he cursed or abused her or threatened to kill her.

Petta had simply grown tired of his illicit relations with this woman, and told her to get out. It has been well said that "hell hath no fury like a woman scorned." Mrs. Simoneaux, in spite of the request of Petta to leave the house, deliberately returned, hours before Petta came back; secured his pistol; concealed it in her bosom; and shot him down in cold blood, through

resentment and revenge because he had discarded her and told her to leave.

It would have been a physical impossibility for Petta to have walked from the sofa chair or sofa in the rear of the front room to the front door, if he had assaulted and threatened to kill Mrs. Simoneaux, while she was either at or on the sofa chair or sofa, and the shooting had taken place then and there. Petta had been shot through the back of the head; the bullet passing through the brain. He had been shot twice through the right and left lungs and twice through the heart, and once in the abdomen. His wounds were of a character, so severe and fatal, that common sense tells us that he would have fallen in his tracks on the spot in which he stood when the shots were fired from the deadly Smith & Wesson pistol. That his body was found at the *front* door, instead of in the *rear* of the front room, where the shooting took place, is to our minds a most suspicious and significant fact. Such are the physical facts of the case. In addition to this, Petta was, to all intents and purposes, in so far as fighting or protecting himself, almost blind. Dr. Smith, an eminent occulist, stated positively that Petta was blind in one eye, and had only one-fifth vision in the other eye, which was limited to a ten-degree field. When the learned doctor was asked by the trial judge if Petta could have protected himself in a fight, the answer was in the negative.

The facts show that Mrs. Simoneaux was a large, powerful woman; that she sat with a loaded pistol on her person, and calmly shot a practically blind man to death, knowing at the time he was unarmed, and that there was no possibility of his arming himself because she herself had his pistol. At no time was her life in any danger. There is nothing in the record, not even the self-serving statements of Mrs. Simoneaux, which contains contradictions to prove defendant company's special defense of aggression and assault by Petta upon Mrs. Simoneaux.

2. This case is somewhat anomalous, in that plaintiff contends that Mrs. Simoneaux was insane at the time of the homicide, and defendant company, on the other hand, insists that she was sane.

In commenting upon this phase of the case, the trial judge in his opinion states in part: "It is absolutely certain whether she was sane or insane that night, at no time was her life in danger. If she was sane, then from her own statement she was a cold blooded murderer. It is impossible for one to understand why the defendant Insurance Company so strenuously endeavored to prove that Mrs. Simoneaux was sane. In my opinion, the saner she was, the more guilty she was of murder."

At the time Mrs. Simoneaux gave her depositions she was confronted with a charge of manslaughter in the criminal courts of the parish of Orleans. Her contradictory statements cannot be relied upon to prove self-defense, not only because she was strongly tempted, at the time, to falsify; but for the further reason that such statements are flatly contradicted by the physical facts of the case.

3. Defendant company introduced the sister of the slayer of assured, her nephew, and her brother-in-law, and also one of its employees to show that Paul Petta was a man of violent temper, quarrelsome, etc., and that his eyesight was sufficient to enable him to drive an automobile around the busy streets of the city of New Orleans, to use weighing scales, read newspapers, and that he was able to get about as well as a man with normal sight.

In the face of the proof of payment of $100 per month by defendant company to Paul Petta for total and permanent disability, admitted in evidence in corroboration of Dr. Smith's testimony that Petta was to all intents and purposes permanently and totally blind because of greatly impaired vision, we are constrained to attach but small importance to the testimony of defendant company's witnesses. The trial judge did not accept such testimony as persuasive.

On the other hand, plaintiff produced Mr. Louis Knop of the civil sheriff's office, Joseph Matranga, and Bernard Darcangelo. All of these witnesses have known Petta for a number of years and testified that he was "good-hearted," had an "easygoing disposition," "enjoyed a wide circle of friends," and that they had never known of his having been in trouble. These are disinterested witnesses. They were deemed trustworthy by the trial judge, and we find no good reason to depart from his finding.

4. The following authorities support the contention of plaintiff that she has dis-

charged the burden of proof resting upon her in this case:

In Buckley v. Massachusetts Bonding & Ins. Co., 113 Wash. 13, 192 P. 924, 925, 929, it is stated: "It must be remembered that the respondent did not have to prove her case beyond a reasonable doubt. She had only the burden of proof. If she has made it appear by a preponderance of the evidence that her intestate met his death by unlawful means, she has met that burden. * * * The presumption arising from the disposition and habits of Buckley, shown by the record, is against the conclusion that he would willfully and wantonly assault another."

And, from the testimony of plaintiff's witnesses as to the good character of Paul Petta, the same presumption arises in this case.

In Jenkin v. Pacific Mut. Life Ins. Co., 131 Cal. 121, 63 P. 180, 181, the court said: "The burden is undoubtedly on the plaintiff by the very terms of the contract to show that the wound was inflicted accidentally, but it is not necessary, for him to make out his case, that he should produce the direct testimony of eyewitnesses. * * * That the courts will presume that the death was the result of an accident, when nothing more is shown than that it was brought about by a violent injury, and the character of such injury is consistent with the theory of accident, seems to be a rule upheld by the great weight of authority. * * * If the circumstances placed in evidence, and the inferences to be drawn therefrom, and the presumptions arising thereon, point

clearly to an accidental injury, the plaintiff has made out a prima facie case, and is entitled to a finding in his favor."

In Konrad v. Union Casualty & Surety Co., 49 La.Ann. 636, 637, 21 So. 721, 723, the court said: "If it be manifest that death was neither occasioned by natural causes nor by the deceased himself, it at once becomes evident that the 'violent and accidental' must be considered as cause. * * * It may be logically inferred—indeed, it must be inferred, as it was not a natural death or a suicide—that the death was caused by external violence and accidental means."

In Meadows v. Pacific Mut. Ins. Co., 129 Mo. 76, 31 S.W. 578, 583; 50 Am. St.Rep. 427, the court held: "The plaintiff showed, beyond controversy, that Daniel Meadows died by violent injuries, which were plainly visible upon his body; that the nature of these injuries left no doubt that they were the sole cause of his death; and proper proofs were made. Here he rested. He had made a prima facie case."

In Martin v. Mutual Life Insurance Co., 106 W.Va. 533, 146 S.E. 53, 56, it is said: "The plaintiff made out a prima facie case when she introduced proof establishing the death of Martin by external and violent means. 1 C.J. p. 495, § 278; Fidelity & Cas. Co. v. Weise, 80 Ill.App. 499; Whitlatch v. Fidelity & Cas. Co., 71 Hun, 146, 24 N.Y.S. 537; * * * Nerrow v. Pacific Mut. Life Ins. Co. (Mo.App.) 204 S.W. 97. The proof of death by such means raised a presumption that the

insured's death was accidental. * * * It then became incumbent upon the defendant insurance company to meet this prima facie case by affirmatively showing that the deceased came to his death as a result of a violation of law"—citing Sovereign Camp of Woodmen of the World v. Jackson (Tex.Civ.App.) 138 S. . W. 1157; Gilkey v. Sovereign Camp of Woodmen of the World (Mo.App.) 178 S.W. 875–877; 14 R.C.L. par. 599, p. 1437; Fidelity & Cas. Co. v. Weise, 80 Ill.App. 499.

In Beco v. Peoples Industrial Life Ins. Co., 9 La.App. 371, 119 So. 281, 282, the court said: "The contention that the deceased was engaged in a violation of law at the time he met his death, and that therefore the beneficiary should not recover * * * is a special defense, and the burden of proving it plainly rests upon the defendant."

Plaintiff offered in evidence the coroner's inquest showing that the cause of death was "hemorrhage and shock from multiple gun shot wounds," which are therein specifically described.

The burden of proving the special defense in this case then rested upon the defendant company, which, in our opinion, has failed to sustain the special defense.

Our conclusion is that Petta met his death by accidental means in accordance with the terms of the policies, and that his lawful widow, the beneficiary, should recover the double indemnity sued for by her in this case.

It is therefore ordered that the judgment appealed from be affirmed, and that the defendant, Metropolitan Life Insurance Company, pay all costs of this suit.

O'NIELL, C. J., absent.