This is a suit by the designated beneficiary in a life insurance policy which contains a stipulation for the payment of double the face amount of the policy should the death of the insured result directly from bodily injury effected through external violent and accidental means. *Page 49 
The policy contained a further stipulation to the effect that the double indemnity provided for in the event of such accidental death should not be payable "if the insured's death resulted, directly or indirectly, from * * * war or any act incident thereto * * *."
The insured, Anthony A. Bologna, died as the result of an accident which occurred while he was a merchant seaman on a vessel traveling in the North Atlantic Ocean on August 19th, 1943. The named beneficiary demanded payment of the face amount of the policy, together with an additional $1,000 as the double indemnity provided for in the event of accidental death.
The insurer has at all times been willing to pay the face amount due on the policy, but has refused to pay the additional $1,000, asserting that the death of Bologna resulted directly or indirectly from war or an act incident thereto. Plaintiff was unwilling to accept the face amount and brought this suit. Defendant set forth in its answer that the amount due under the policy was the face value thereof, to wit, $1,000 plus interest and dividends, less, however, a policy loan and interest, making the amount due $945.46, and defendant averred that "it has repeatedly tendered, and does hereby tender again * * *" this amount. There was judgment in favor of plaintiff for $945.46, and plaintiff was required in that judgment to pay all costs. Plaintiff has appealed.
Subsequent to the appeal plaintiff accepted the amount awarded her under the judgment appealed from without prejudice to her rights to proceed with her appeal. Thus the sole question now before us is whether or not plaintiff is entitled to the additional $1,000 provided for in the event of accidental death, or whether she should be denied that recovery on the ground that recovery of that double indemnity is barred by the policy clause which provides that it shall not be payable in the event death results directly or indirectly from war or any act incident thereto.
The plaintiff, prior to her first marriage, was Virginia Porretto. She was the wife of Anthony A. Bologna and was the beneficiary named in the policy, and some time after the death of Bologna, she became the wife of Francis B. Ryan, to whom she is now married. The defendant is New York Life Insurance Company.
There is no dispute over the facts. They are set forth in a written stipulation from which we quote the following pertinent paragraphs:
"A. At the time of his death on August 19, 1943, insured was, and had been since July 24, 1943, an assistant purser, actively engaged in the United States Maritime Service, and was on the aforesaid date serving in such capacity board the SS J. Pinckney Henderson, a United States merchant ship, operated on behalf of the War Shipping Administration by the United Fruit Company, having signed on said vessel July 24, 1943 in Galveston, Texas.
"B. On August 19, 1943, while Anthony A. Bologna was still a member of the crew, the Henderson was travelling in convoy with 56 other merchant ships and 4 armed escort vessels, bound for the United Kingdom. At about 9:20 P.M., at a point about 300 miles off Nova Scotia, the Henderson, which was at that time in convoy position 42, collided with the SS J. H. Senior, a tanker of United States register, travelling in convoy position 32. That at the time of the said collision, the said convoy was operating under order from and under the operating control of U.S. Navy Commander Eastern Sea Frontier.
"C. At the time of the said collision, the Henderson was carrying a war cargo consisting of cotton, magnesium, magnesite, glycerine, rosin, wax, oil, carbon black and other combustibles, and on its deck a cargo of army trucks. The Senior was loaded with high octane gasoline and a deck cargo of war planes. Both ships had the usual merchant ship complement of armed guards and guns and ammunition for servicing said armament.
"D. Both the Senior and the Henderson, as well as the other ships and escorts in the convoy were blacked out, as required by convoy regulations; there was no internship communication, and no fog signals were in operation.
"E. Immediately after the collision, which occurred during a dense fog, with moderate wind and slight swells, fire broke *Page 50 
out on both vessels. The high octane aviation gasoline from the Senior spread over both ships and ignited the cargo of the Henderson. There was a series of heavy explosions, and in a few minutes both vessels were afire from stem to stern.
"F. Burning oil from the tanks of the Senior spread over the water. The fire on the Henderson spread rapidly, enveloping the decks and living quarters. Many of her crew and armed guards were trapped below decks and perished. All but three of said crew, who were able to gain the decks, were forced overboard by the fire, and also perished. Only three merchant seamen from the Henderson survived, all of whom suffered personal injuries. The flames aboard the Henderson spread so rapidly that it was impossible to lower a single lifeboat or raft.
"G. The flames and fire were so hot and made the Henderson so hot that four men, including Anthony A. Bologna, jumped over the starboard side into the flaming oil and gasoline. The burning gasoline spread from the Senior not only enveloped both ships but covered the sea surrounding the Henderson and was burning at the time the above mentioned men abandoned the Henderson.
"H. Anthony A. Bologna has never been seen nor heard from since he jumped over the starboard side of the Henderson on August 18, 1943 during the fire resulting from the above mentioned collision.
"I. The Henderson on July 24, 1943 and at all times to and including August 19, 1943 was of American registry and was flying the American flag."
Since the stipulated facts show that the death of the insured resulted directly and independently of all causes from bodily injury effected solely "through external, violent and accidental means", and "occurred within ninety days after such injury * * *," the burden of showing that nevertheless the double indemnity is not due was placed upon the defendant by its contention that the accident resulted directly or indirectly from war or any act incident thereto, and the defendant is under the duty of showing that that policy provision is effective under the facts shown here. That the burden is on defendant in such situation is well settled. Cutitto v. Metropolitan Life Ins. Co., 185 La. 161,168 So. 761; Bankson v. Mutual Ben. Health Accident Ass'n,208 La. 1008, 24 So.2d 59; Massachusetts Protective Ass'n, Inc., v. Ferguson, 168 La. 271, 121 So. 863; Heiman v. Pan American Life Ins. Co., 183 La. 1045, 165 So. 195; Lafield v. New York Life Ins. Co., La. App., 9 So.2d 248.
It must also be conceded that such a clause as defendant relies on is a valid and binding one provided it is not ambiguous, and that if the facts stipulated make the clause applicable, then the double indemnity was properly denied. Edwards v. Life Casualty Ins. Co. of Tennessee, 210 La. 1024, 29 So. 50, 51. See, also, 37 C.J., Life Insurance, Section 46, page 383; 45 C.J.S., Insurance, § 849.
In the Edwards case, the Supreme Court said: "* * * while all ambiguities must be construed in favor of the insured and against the insurer the courts have no authority to change or alter their terms, under the guise of interpretation, when they are couched in clear and unambiguous language, * * *."
And the Court further stated: "* * * that according to the great weight of authority a provision in a policy limiting the liability or exempting the insurer from liability while the insured is engaged in the naval or military service is valid and not against public policy, * * *".
There is in reality no disagreement between counsel over the fact that in such policies these clauses limiting or exempting from liability are usually of one or the other of two kinds, — in one group are those policies which contain what is commonly known as a "status" clause; in the other are those containing what is usually referred to as a "result" clause. In the former, recovery is denied if the insured is a member of some particular designated group, such as the Army or the Navy. In the other group it is stipulated that recovery will be denied not because of the status of the insured as a member of any particular group, but if his death results from some particular cause.
And in reality counsel do not disagree over the fact that the clause here is a "result" *Page 51 
clause and that, therefore, recovery depends upon the cause of the accident and not upon the status of the insured. Counsel for plaintiff asserts that since the clause is a "result" clause and since recovery of double indemnity may be denied only if death resulted from war or any act incident thereto, recovery cannot be denied since, so counsel declares, not only was the insured not engaged in war but, as a matter of fact, there is nothing to show that war was being waged in the locality in which the accident occurred. And, furthermore, argues counsel the facts show that the accident resulted not from a war hazard but from a marine risk. He says that the danger of a collision at sea is a marine risk, and that, consequently, whatever may be the surrounding circumstances, the cause of the loss was merely a collision at sea which is a marine risk and nothing more.
We disagree with the contention that there was nothing to show that war was being waged in the North Atlantic at that time. Even if we had no knowledge of what was going on in that area, we think that the facts as stipulated unmistakably portray the existence of armed naval conflict. In the first place, both the vessels which collided "had the usual merchant ship complement of armed guards and guns and ammunition for servicing said armament." And both were loaded with war material. In addition to the fact that both vessels were armed and loaded with war material, which, it is true, was intended for use in other theatres of war, both, and all other vessels in the convoy, were operating without any signals or internship communications in spite of the fact that they were travelling at night and in a fog. All of these facts, which are set forth in the stipulation, show conclusively, we think, that there was constant fear of an attack in that particular theater. And, as a matter of fact, all of the vessels were being escorted at that particular point by four armed escort vessels of the United States Navy, and all of these precautions were being taken under orders of the proper officials of the United States Navy. But even without those stipulations, we could not bind ourselves to the facts of which the entire world at that time had knowledge. We realize that there are limitations to those facts of which the judicial mind is permitted to take cognizance. But the existence of a war in which our country is an active participant is a fact of which we must be aware as judges as well as citizens. That we may in fact take judicial notice of the existence of such a war has often been held. Ex parte Zimmerman, 9 Cir., 132 F.2d 442, 445; State Mutual Insurance Co. v. Harmon, 72 Ga. App. 117, 33 S.E.2d 105, 108; Weisman v. United States, 7 Cir., 271. F. 944, 945; Stankus v. New York Life Ins. Co., 312 Mass. 366, 44 N.E.2d 687, 689; Hooker v. New York Life Ins. Co., 7 Cir., 161 F.2d 852.
Counsel for plaintiff, in his brief, says that: "* * * If there ever was an actual 'Battle of the Atlantic' outside of the columns of the newspapers, there is certainly no scintilla of proof in this record that there was such a battle, and there is absolutely nothing in the record to place the accident in which insured died even in the area where that imaginary battle is supposed to have occurred, much less to establish that his vessel and he were connected with or engaged in that battle when the accident occurred."
We find ourselves in violent disagreement with the above statement and we conclude from the judicial knowledge, which we have and are entitled to have, and from the facts as stipulated that there was a battle which was raging at that time and that the vessel on which the insured was travelling was taking part in that battle just as surely as if there had been firing of guns toward an enemy vessel or from an enemy vessel towards it.
Having then concluded that there was a war in progress which was having effect in that particular locality at that particular time, we pass on to a consideration of the question of whether or not the accident was caused directly or indirectly by that war or any act incident thereto. And here we note the very vigorous contention of counsel for plaintiff that, in this connection, we should apply the reasoning found in many cases in which it was attempted to lay down a rule from which it might be determined *Page 52 
whether any particular loss at sea resulted from a risk of the sea or from a hazard of war.
In the first place, we are well convinced that the exclusion clause relied upon by defendant may be applicable even though the accident which is relied on may not have resulted from actual combat. We agree with what was said by the Supreme Court of Iowa in Eggena v. New York Life Insurance Company, 236 Iowa 262,18 N.W.2d 530, 534, in which this same clause was relied on by this same defendant, that: "A clause excluding liability in the event death results directly or indirectly from war, we are satisfied, must apply to a member of the military forces, a member of an army tank crew, on active duty, while in the line of duty, acting under orders from superior officers and carrying out a military assignment as a part of his training during the prosecution of war. The death of insured was the direct result of an act incident to war. * * * We can conceive of no part of a soldier's duties while an active member of a military force, except actual combat, which is more directly traceable to war than the performance of the duties in which deceased was engaged at the time of the fatal accident. This would be the common understanding of an injury caused by war and it was so reported by insured's superior officer. It was a result of war, and as such the exclusionary clause applied."
The insured was not engaged in actual combat in Hooker v. New York Life Insurance Company, 161 F.2d 852, and yet the United States Circuit Court of Appeals for the Seventh Circuit held that because of that same clause there could be no recovery. There the Court said: "* * * The insured at the time of his death (May 19, 1943) and previous thereto was a captain in the United States Marines, assigned to Company 'E,' Third Tank Battalion, Third Marine Division, which was a part of the 21st Regiment of the United States Marines. On the date of the fatal accident this regiment was stationed in New Zealand and was engaged in war training maneuvers over an area of several square miles, about one mile from the bivouac area near Auckland. On the second or third day of the maneuvers Captain Hooker, while playing the role of a scout, was captured by the 'enemy' (Company "E", Second Battalion, 21st Marines), and turned over to a patrol composed of about six members of Company 'E,' to be taken as a 'prisoner' to their command post. On this return trip, while the patrol had stopped for rest, Captain Hooker, taking the guards by surprise, made a break to escape. In his effort to do so he ran about one hundred yards with the guards in pursuit, when suddenly in the chase he leaped over a fence, breaking through bushes which were later found to cover the edge of a cliff about 60 or 75 feet deep. He fell over the cliff and was discovered below by the chasing patrol. He was semi-conscious and kept repeating such phrases as 'have to get away' and 'can't be captured.' The accident happened about 2:30 p.m. and he died a few hours later from the injuries sustained in the fall. * * *"
We deem it of no importance that Bologna was in the Merchant Marine service and not actually in the Armed Forces since it is clear that the clause in question is a "result" clause and not a "status" clause.
In Vanderbilt v. Travelers' Insurance Company, 235 N.Y. 514,139 N.E. 715, the insured was a civilian. The important thing is not the status of the insured but it is the cause of the accident which resulted in the loss. And we call attention to the fact that the cause need not be the proximate cause, but may be something which indirectly results from any incident of war, although we may say here that it is common knowledge that our merchant seamen were as actively engaged in fighting the recent war as were the members of the various services usually referred to as our Armed Forces.
When this case was first argued before us, counsel for plaintiff-appellant placed great reliance on the Hooker case, supra, which at that time had not been decided on appeal. That decision has since been reversed by the United States Court of Appeals for the Seventh Circuit, and the decision as rendered by that Court appears to us to be a tremendous barrier in plaintiff's path. We quote again from that decision: "* * * To think, as plaintiff would *Page 53 
have us do, that war as used and intended by the parties was confined to combat service is to attribute to the word a meaning that is unnatural and unreal. Combat service is only the culmination of the myriad separate and independent acts all of which are an essential part of war. * * *"
Again we say that counsel for plaintiff vehemently contends that we should follow certain cases relied on by him as laying down a rule by which it may be determined in any given set of circumstances whether the loss has resulted from a risk of war or a peril of the sea and he argues that in every case the risk must be definitely put into one category or into the other. We readily concede that ordinarily a collision at sea may be classified as a marine accident and may be said to result from a peril of the sea. And possibly if we were called upon to determine whether the death of Bologna resulted proximately from a war occurrence or proximately from a marine accident, we might say what the Supreme Court of the United States said in Queen Insurance Co. of America v. Globe Rutgers Fire Insurance Co., 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402, and what it had previously said in Morgan v. United States, 14 Wall. 531, 20 L.Ed. 738, that possibly as between the two the accident could be said to have resulted proximately from a marine risk. But that is not the question which is presented here, for here the framers of the policy were careful to say that the double indemnity feature is eliminated not only if the loss results proximately from a war risk, but also if it results directly or indirectly from any incident of war.
Queen Insurance Co. v. Globe Rutgers Fire Insurance Co, supra, is greatly relied upon by plaintiff, and unless analyzed, seems to be very potent authority in her favor. But we think that that case and Morgan v. United States, supra, are clearly distinguishable. In the first place, as we have said, in each of those cases the question involved was whether the loss should be charged to a war risk or to a marine disaster. In other words, the Court was faced with the necessity of definitely placing the loss into one group or into the other. The Court found it necessary to determine the proximate cause and could not go further and find whether the loss could be traceable indirectly to any other cause.
The Queen Insurance Company case may be distinguished from the case at bar on the ground that there the ship had not been required to join the convoy, but had done so because the master thought it best, whereas here the ship was in convoy by military orders. It was also forced to operate completely without lights, completely without fog signals, and completely without internship communications, and all of this because of military orders.
That there is a distinction due to the fact that in the Queen Insurance case the ship was not ordered to join the convoy is obvious and this distinction was pointed out by Mr. Justice Holmes of the Supreme Court of the United States, who was the author of the opinion in that case and who, in Standard Oil Company of New Jersey v. United States, 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519, plainly said that the jurisprudence reached in the Queen Insurance case was based largely on the fact that the vessel had not been taken from the owners by military orders, but had joined the convoy voluntarily.
It is very obvious, too, that even in the Queen Insurance Company case, Mr. Justice Holmes found it a little difficult to reach the conclusion which he did, for he said [263 U.S. 487, 44 S.Ct. 176]: "* * * There are special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business, and as we could not reverse the decision below without overruling Morgan v. United States, we are of opinion that the decree of the Circuit Court of Appeals must be affirmed. * * *"
Viewing the matter as a whole, our opinion is that such an exclusion clause is effective whether the insured is a member of the Armed Forces or not and whether or not there is actual combat at the time of the accident, provided the conditions are what they were shown to be in the agreed statement of facts.
In Morgan v. United States, supra, the Supreme Court of the United States was called upon to definitely place the risk in one category or in the other. The United *Page 54 
States had chartered a vessel from a private owner and had agreed that if loss should result from a war risk it would be responsible, but that if loss should result from a marine risk the owner would bear that loss. In that situation the Court found that the stranding, because of putting to sea to avoid enemy attack, was the result of a marine peril. The Court held that in that situation it could look only to the proximate cause and could not "proceed further in order to find out whether the fact of war did not create the exigency * * *."
Every marine collision results from some cause. It may be because the helmsman of one ship is careless, or it may be because there is something defective about the steering apparatus of one or both of the vessels involved, or it may be the result of signals being misunderstood. All of those things and many others constitute what may be termed marine risks and any one of those risks might cause an accident in time of peace. But here the cause of the collision was obviously the fact that it was necessary to operate the vessels without signals and under the conditions already set forth, and those necessities were the direct result of the fact that the country was at war and that as an incident of war the ships were required to travel under those extremely dangerous conditions even though both vessels were heavily loaded with war material, explosive, combustible material at that. That in itself was an incident of war. They were both in a large convoy operating under military orders. That was an incident of war. They were in a fog at night and were operating without lights, signals, or internship communications. These certainly were incidents of war.
It is argued that if double indemnity should be disallowed in this case, it would be necessary to refuse to allow it in any case no matter how remotely the accident might have resulted from war. It is said, for instance, if in any one of our American cities during a war a blackout had been ordered and as a result two automobiles had collided, it would have been necessary to hold that the double indemnity feature of such a policy would not be effective. Our answer is that always a reasonable interpretation must be given to the clause in the policy, and we say exactly what the United States Circuit Court of Appeals said in the Hooker case, supra: "Numerous hypothetical injuries have been cited and many others could be conjured to which the exclusion clause might not be applicable. As to some, no doubt, a plausible argument can be made that such is the case. Generally, as shown by the cases, they may be classified as injuries not peculiar to the military service but those equally likely to occur in civilian life. In other words, they are not the result of military service or war. We need not attempt, however, to draw the line between those which are excluded and those which are not, and neither do we need to consider or decide hypothetical or imaginary cases. Our duty is to decide the question presented on the facts of this case and not some other."
As a matter of fact, in Smith v. New York Life Insurance Co., Ohio Com.Pl. 1948, 86 N.E.2d 340, one of those hypothetical situations suggested by plaintiff was actually presented to the Court. There a civilian war worker in a bomb manufacturing plant in this country was killed when certain war material exploded from an unknown cause. This accident occurred hundreds of miles from a combat area. The same clause which is presented to us was involved and the Court said:
"Counsel for plaintiff take the position that the exceptions must be drawn close to the battle front and are not intended to include civilian workmen. This ignores the express provisions of the policy. The exemption is not confined to those in military service nor to the locale or vicinity of battle. The term 'war' has a far broader meaning than combat or battle and relates to civilians, soldiers and sailors alike and to any place irrespective of its proximity to or distance from actual conflict.
* * * * * *
"Certainly there can be but little argument, but that the raising, training, equipping and transportation of troops, and the transporting, either by land, sea or water, of munitions of war for use in the waging of an existing war, are incidents of that war, since they are acts which are not incident to anything but war. Is the actual manufacture and handling of high explosives *Page 55 
designed exclusively for use in the same war to be considered in any other light than that the same constitute acts incident to war? As stated in the case of Eggena v. New York Life Insurance Co., supra [236 Iowa 262, 18 N.W.2d 530], such acts are incident to nothing other than war, and without war would not occur.
"There is a wide difference between making and handling high explosives, the only use of which is for the prosecution of a war and the farmer who raises food, which ultimately may be used to feed the countries' soldiers, or cotton which may be used in the manufacture of deadly explosives for use in the prosecution of the war. Such acts may be incident to hundreds of activities other than war.
"In the instant case the insured was directly engaged in the preparation of high explosives for exclusive use in the prosecution of the war in which this country was engaged.
"But for the war he would not have been so engaged, so that the conclusion must be reached that he was engaged in an act incident to war and the explosion which caused his death was likewise an act incident to war and that the provision in the policy for payment of double liability does not apply since the facts of insured's death came within the plain provisions of the exceptions."
Counsel cite many other cases, several of which have been decided since this case was first argued before us. And we find that these cases indicate a very definite trend towards a holding that an accident resulting from any dangerous situation created because of the existence of a war may be pointed to as an act incident to war.
In Railey v. United Life Accident Insurance Co.,26 Ga. App. 269, 106 S.E. 203, a soldier of the United States Army was killed or drowned when the ship on which he was being transported to Europe to take part in the first World War collided with another ship. The Court held that he lost his life as the result of an incident of war.
In Selenack v. Prudential Insurance Co., 160 Pa. Super. 242,50 A.2d 736, 739, the insured was taking part in training demonstrations in this country and he was in the turret of a tank. In order to avoid another vehicle, the tank was driven over an embankment and Selenack was killed. It was argued that his death did not result from military service in time of war. The Court said: "* * * Death resulting from military service in time of war comprehends death in actual combat but is not so restricted as to exclude death under other circumstances, * * *."
In Coxe v. Employers' Liability Corp., Ltd., 2 K.B. 629, a captain in the English army was assigned to guard a railroad station in London. He was struck by a locomotive and killed. The insurance policy involved covered death by accident but excluded recovery for any fatal accident "directly or indirectly caused by, arising from or traceable to * * * war." The Court held that recovery should be denied, saying: "* * * the words which I find it impossible to escape from are 'directly or indirectly.'"
In Thompson, Sr. v. New York Life Insurance Co., Com.Pleas S.C., 13 Life Cases 235, the policy which was involved contained provisions identical with those which confront us. There a lieutenant in the United States Army was a member of the crew of an army plane transporting troops back to this country after the surrender of the Japanese but before Congress declared the war to have terminated. The Court said that the transporting of those troops was "casually related to the war * * *." Surely the transporting of munitions of war is also causally related to war.
In Clarke v. New York Life Insurance Co., Com.Pleas S.C., 13 Life Cases, 239, Colonel Clarke was engaged in administrative duty. He was being transported by plane from Athens, Georgia, to Tampa, Florida. The policy which was involved contained the identical provision which is found in the policy in the case at bar. The Court said his death had resulted from war or some act incident thereto, and that "* * * If it had not been for the war he would not have been in the army; he would not have been on this airplane. * * *."
In Stankus v. New York Life Insurance Co., 312 Mass. 366,44 N.E.2d 687, 688, we again find a policy provision identical with *Page 56 
that before us now, A seaman was lost when the vessel on which he was engaged was sunk by German torpedo in the North Atlantic. Among other things, the Court said: "* * * The term 'war' is not limited, restricted or modified by anything appearing in the policy. It refers to no particular type or kind of war, but applies in general to every situation that ordinary people would commonly regard as war. * * *"
The opinion goes on to discuss the situation which was then existing in the North Atlantic, the Court saying: "In the light of these reports, the attacks upon shipping in the North Atlantic during the summer and fall of 1941, the damage to two of our destroyers and the sinking of a third by submarines were events that arose out of attempts to stop the flow of war materials and supplies to Great Britain. While the nationality of these submarines is not mentioned in the statement of agreed facts, the conclusion is inescapable that they belonged to a nation at war with Great Britain. Great Britain was then at war with Germany and Italy. The President, on September 11, 1941, had stated that German or Italian vessels of war entered these waters at their peril. The sinking by German or Italian submarines of ships belonging to a belligerent nation, or of ships of another nation convoying war materials and supplies to a belligerent nation, is the usual result of waging war by one nation against another, Prize Cases (The Amy Warwick), 2 Black 635, 17 L.Ed. 59, and the torpedoing of the Reuben James while convoying vessels engaged in such traffic was an act that arose out of the prosecution of such a war. It follows that the death of the insured arose directly or indirectly from war and was not a risk covered by the double indemnity provisions of the policy. Vanderbilt v. Travelers' Ins. Co., 112 Misc. 248, 184 N YS. 54; Id., 235 N.Y. 514, 139 N.E. 715; Letts v. Excess Ins. Co., 32 T.L.R. 361. See Coxe v. Employers' Liability Assurance Corporation, Ltd., [1916], 2 K.B. 629; Parker v. Anderson, 112 Vt. 371, 25 A.2d 41."
If the sinking of our vessels in that area at that time was, as we know it was, the result of war, then surely the throwing aside of all precaution in an effort to avoid the possibility of sinking was the direct result of an incident of war and the consequent accidents, this and no doubt others, which resulted, were traceable directly to incidents of war.
Counsel for plaintiff places much reliance of Johnson v. Mutual Life Insurance Co., 154 Ga. 653, 115 S.E. 14. There the insured, a soldier, was on a troop train in the United States. He was killed when his head struck an overhanging girder. The Court held that his death did not result from war or any incident thereto, but the Court very plainly said that there had been no showing that the accident had occurred during wartime. As a matter of fact, the accident occurred almost a year after the declaration of the Armistice which ended World War One.
Counsel for plaintiff points with great confidence to the decision of the Supreme Court of Louisiana in Edwards v. Life Casualty Insurance Co. of Tenn., 210 La. 1024, 29 So.2d 50, 53. In that case two policies of insurance were involved. When suit was brought on those two policies, the defendant took the position that the clause which precluded recovery was a status clause; in other words, that the insured was a member of the Armed Forces and, not having obtained the permission of the insurer and not having paid the additional premium required, had lost the coverage of the policy. Our Supreme Court held that the clauses involved in those policies were "result" clauses insofar as that particular case was concerned. And that Court said that since the coverage of the policies would have been lost only if the dead of the insured resulted from a risk of war, there could be recovery since the death had resulted from pneumonia contracted in this country and occurring in a hospital in this country. The Supreme Court said: "* * * it appears there is nothing that would even remotely indicate any causal connection between the insured's death and the naval service in which he was enrolled at the time of his death * * *."
In the case before us it will not do to say that because the accident — a collision at sea — might have occurred had there *Page 57 
been no war and had the ships been travelling under peacetime conditions, such a collision occurred solely and only as the result of a marine risk and was not indirectly the result of war or any act incident thereto. While, as we have said, it cannot be denied that certain marine risks always exist, the risk of collision here was tremendously enhanced by the conditions under which these vessels were travelling and therefore, in our opinion, these conditions were, to say the least, indirectly, if not directly, the cause of the disaster.
We are not impressed by the argument that the exclusion clause relied on by plaintiff is vague in that it does not with definiteness and precision point out just what should be considered as acts incident to war and that, therefore, because of that vagueness the clause should not be enforced.
It is always a dangerous thing to attempt to set forth with definiteness and precision all of the various facts or situations which may be contemplated in such a clause. If it is attempted to include all possible situations then there is always the fear that one or more may be omitted and if so, it will certainly be argued that by including those set forth there was manifested an intention to exclude all others. It is safer to word such an exclusion in general terms and to leave it to the courts when necessary to determine just whether the facts of any particular case do or do not bring it within the contemplation of the clause. That is what was done here. And our conclusion is that the facts presented make the clause applicable and bar the claim of plaintiff for double indemnity.
Since the defendant tendered the amount which was awarded in the judgment below, it is obvious that the district court was correct in requiring plaintiff to pay the costs.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.