VASHTI LARUE v. THE KANSAS MUTUAL LIFE
INSURANCE COMPANY..

**No. 13,499.** ( 75 Pac. 494.)

| 68 | 539 |
|----|-----|
| 71 | 820 |
| 68 | 539 |
| 72 | 47 |
| 73 | 501 |

SYLLABUS BY THE COURT.

1. LIFE INSURANCE—*Liability Limited in Case of Death while in Military Service.* A policy of life insurance provided that the insured might serve in the military service of the United States in time of war by giving the insurance company notice and paying an extra premium for the war hazard; otherwise, in case of death, the company should be liable for the reserve on the policy only. The insured enlisted in the service of the United States and was killed on the island of Mindanao, one of the Philippines, in May, 1900. No extra premium was paid. *Held,* that the company was not liable for more than the reserve on the policy.

2. JUDICIAL NOTICE—*Treaty with Spain—Philippine Insurrection.* Courts of this country take judicial notice that under the treaty of Paris, between the United States and the kingdom of Spain, signed December 10, 1898, the Philippine islands became a part of our territory, and that after that time the inhabitants of those islands were in a state of insurrection against the government. Judicial notice is taken also of the fact that in 1902 the insurrection had not ended in the island of Mindanao.

Error from Coffey district court; DENNIS MADDEN, judge. Opinion filed February 6, 1904. Affirmed.

*Joe Rolston,* and *C. B. Graves,* for plaintiff in error.

*Theodore K. Long, Henry W. Price,* and *Herrick & Allen,* for defendant in error.

The opinion of the court was delivered by

SMITH, J. : Edward LaRue, son of the plaintiff in error, was insured in the sum of $1000 by the Kansas Mutual Life Insurance Company under a policy which contained the following condition :

"Military or Naval Service.—The insured under this policy is permitted to serve in the militia or in the military or naval force of the United States in

time of peace without prejudice to his policy; and he may so serve in time of war by giving the company notice in writing, and paying an extra premium therefor, not to exceed three per cent per annum upon the amount insured. But should such notice not be given and the extra premium for war hazard not be paid at the time the risk is incurred, the company will be liable for the reserve only on this policy, computed according to the actuaries' table of mortality and four per cent. interest."

In September, 1899, the policy being in force, LaRue enlisted in the volunteer service of the United States and went with his regiment to the Philippine islands. No extra premium was paid on the policy. In May, 1900, he was killed at the village of Loculan in the island of Mindanao, by a blow from a weapon known as a bolo, in the hands of an insurrecto. Such facts appeared in the proofs of death given to the company.

This was an action by the mother of the deceased, and beneficiary under the policy, to recover the full amount of the insurance. She was defeated in the trial court.

Plaintiff below offered to prove that Loculan, the place where the assured was killed, was in a region where there was no armed resistance against the forces of the United States; that the insured, with his company, was sent there from the island of Luzon, after a period of active service, for the purpose of having an opportunity to rest; that the soldiers stood guard with empty guns; that prior to the death of the insured there was no disturbance of any kind on that island or at that place. The offer of this proof was rejected, on the ground that the court took judicial notice that the inhabitants of the island of Mindanao were at the time in a state of insurrection against the sovereignty of the United States government.

LaRue v. Insurance Co.

The argument of counsel for plaintiff in error is that the condition requiring notice to the company and payment of an extra premium by a policy-holder serving in the military forces in time of war was to enable the company to protect itself against the extra hazard to life resultant on increased danger to which the insured might be subject when engaged in actual warfare. This contention is illustrated by counsel in supposing that the deceased had lost his life at Fort Riley, in this state, after enlistment, and while his regiment was awaiting orders to move to the Philippine islands. In such case, it is urged, the fact that the United States might have been engaged in war when the insured died would not be deemed material. Whatever the rights of the plaintiff in error might have been in the hypothetical case assumed by counsel it is unnecessary to discuss.

We judicially know that under the treaty of Paris between the United States and the kingdom of Spain, signed December 10, 1898, the Philippine islands became a part of the territory of the United States, and that after that time the inhabitants of those islands were in a state of insurrection against our government. The existence of war is a political question and not a judicial one. Courts take notice, without proof, of the acts of the different political departments of the government. (See *Phillips v. Hatch*, 1 Dill. [C. C.] 571, Fed. Cas. No. 11,094.)

In passing on a claim of Lieutenant Stickle for property lost *en route* from West Point to Manila, the war department, in December, 1901, through Secretary Root, announced:

"The insurrection in the Philippines against the sovereignty of the United States and the authority of the government of the Philippine islands is of such character and extent as requires the United States to

prosecute its rights by military force, and therefore creates the condition of war in said archipelago.''

This expression, however, was made at a date subsequent to the death of LaRue.

On July 4, 1902, the president issued a proclamation of amnesty as follows :

"Whereas, The insurrection against the authority and sovereignty of the United States is now at an end, and peace has been established in all parts of the archipelago, except in the country inhabited by the Moro tribes, to which this proclamation does not apply ; and

"Whereas, During the course of the insurrection against the kingdom of Spain and against the government of the United States persons engaged therein, or those in sympathy with or abetting them, committed many acts in violation of the laws of civilized warfare, but it is believed that such acts were generally committed in ignorance of those laws and under orders issued by the civil or insurrectionary leaders : . . .

"Now, therefore, be it known, That I, Theodore Roosevelt, president of the United States of America, by virtue of the authority and power vested in me by the constitution, do hereby proclaim and declare, without reservation or condition, except as hereinafter provided, a full and complete pardon and amnesty to all persons in the Philippine archipelago who have participated in the insurrection aforesaid.''

The Moro tribes mentioned in the preamble of the proclamation inhabit the island of Mindanao, where the insured was killed. The existence of an insurrection there was in this form expressly recognized by the government.

It being established that an insurrection existed in 1901 and 1902, the question still remains whether courts will take knowledge of such insurrection at a prior date, in the absence of a formal declaration of

war.  In *Prize Cases*, 2 Black, 635, 666, 17 L. Ed. 459, the supreme court of the United States has said :

"Insurrection against a government may or may not culminate in an organized rebellion, but a civil war always begins by insurrection against the lawful authority of the government.  A civil war is never solemnly declared ; it becomes such by its accidents— the number, power and organization of the persons who originate and carry it on.  When the party in rebellion occupy and hold in a hostile manner a certain portion of territory ; have declared their independence ; have cast off their allegiance ; have organized armies ; have commenced hostilities against their former sovereign, the world acknowledges them as belligerents, and the contest a war.  They claim to be in arms to establish their liberty and independence, in order to become a sovereign state, while the sovereign party treats them as insurgents and rebels who owe allegiance, and who should be punished with death for their treason.   . . ."

"As a civil war is never publicly proclaimed, *eo nomine*, against insurgents, its actual existence is a fact in our domestic history which the court is bound to notice and to know.

"The true test of its existence, as found in the writings of the sages of the common law, may be thus summarily stated :   'When the regular course of justice is interrupted by revolt, rebellion, or insurrection, so that the courts of justice cannot be kept open, civil war exists and hostilities may be prosecuted on the same footing as if those opposing the government were foreign enemies invading the land.' "

The hostile opposition which continued in the Philippine islands after the treaty of Paris was in the nature of a civil war which, as stated in the above opinion, begins by insurrection, and courts take judicial notice of it as a fact in history.  In *City of Topeka v. Gillett*, 32 Kan. 431, 437, 4 Pac. 800, Mr.

Justice Valentine, speaking for the court on the subject of judicial notice, said :

"Courts may take judicial notice of the census returns, of the general history of the country, of what the members of the legislature ought to know when passing the statute which the courts are called upon to construe ; and, indeed, of what all well-informed persons ought to know."

Every well-informed person knows the history of the late war with Spain and its results. The accession of foreign territory is a part of the world's history. The existence of an insurrection in the newly acquired islands which continued against the authority of the United States after that territory had been obtained from Spain is an event in our national career which every schoolboy knows. Courts would stultify themselves by requiring proof of such public matters, concerning which judges are informed in common with all other persons who read.

Knowing judicially that there was a state of war against the authority of this nation in the Philippine islands immediately after they were acquired from Spain, in 1898, we also know by recitals in the president's proclamation that the insurrection had not ended in 1902, so far as the island of Mindanao was concerned. While stationed on this island the command to which LaRue was attached was in a country whose inhabitants were in a state of hostility to the national authority which he was enlisted to defend. The warlike spirit of these inhabitants increased the peril of a soldier, active or at rest, within that territory in the service of a country to which such insurgents disclaimed allegiance.

The judgment of the court below will be affirmed.

All the Justices concurring.