MARCELLA STANKUS *vs.* NEW YORK LIFE INSURANCE
COMPANY.

Worcester.    September 21, 22, 1942. — October 29, 1942.

Present: FIELD, C.J., DONAHUE, COX, & RONAN, JJ.

*Insurance,* Accident. *War. Evidence,* Judicial notice. *Words,* "War."

Death of a member of the crew of a United States naval vessel, sunk in
the North Atlantic in October, 1941, by a torpedo of a nation at war
with Great Britain when such vessel was engaged under the authority
of the United States government in outranging patrol as a screen for
convoys carrying war materials to Great Britain, arose "directly or
indirectly from . . . war" within a provision excepting such a risk
from double indemnity coverage in a policy of life insurance.
This court took judicial notice of proclamations and reports to Congress
by the President of the United States.

CONTRACT. Writ in the Superior Court dated January
27, 1942.

The case was heard by *Dillon,* J.

*S. B. Milton,* (*R. C. Milton* with him,) for the defendant.

*J. S. Derham,* for the plaintiff.

RONAN, J. This is an action by the beneficiary under a
policy of insurance, issued by the defendant upon the life
of Anthony Stankus, to recover the double indemnity bene-
fit which, she alleges, is payable to her in accordance with
the terms of the policy. The policy provided for the pay-
ment of said indemnity "upon receipt of due proof . . .
that the death of the Insured resulted directly and inde-
pendently of all other causes from bodily injuries effected
solely through external, violent and accidental means . . .
provided, however, that such Double Indemnity shall not
be payable if the Insured's death resulted, directly or in-
directly, from . . . (d) war or any act incident thereto."
The case was submitted to the trial judge upon a statement
of agreed facts. The defendant excepted to a finding for
the plaintiff and to the denial of a request that upon all
the evidence the plaintiff cannot recover.

The insured, a seaman, second class, in the United States Navy, was a member of the crew of the U. S. S. Reuben James and was lost at sea when that vessel, which was one of a squadron of destroyers engaged in outranging patrol as a screen for transports and larger ships making up convoys, was sunk by a torpedo during the night of October 30, 1941, while convoying in the North Atlantic, west of Iceland. For a number of weeks prior to the sinking of this destroyer the United States Army and Navy had maintained military bases in Greenland and Iceland. During the summer and fall of 1941, and before October 30, 1941, several United States merchant ships and merchantmen of foreign registry had been torpedoed in the Atlantic Ocean. The U. S. S. Greer, a destroyer, was engaged in combat with a submarine in the North Atlantic on September 4, 1941, and on October 17, 1941, the U. S. S. Kearny, another destroyer, was torpedoed in an engagement with several submarines which had attacked a convoy in the North Atlantic. The President of the United States in an address on September 11, 1941, stated that the duty of maintaining the American policy of freedom of the seas was the duty of the naval and air patrol, which was operating in large numbers over a vast expanse of the Atlantic Ocean. "Now that means, very simply, very clearly, that our patrolling vessels and planes will protect all merchant ships — not only American ships but ships of any flag, engaged in commerce in our defensive waters. They will protect them from submarines; they will protect them from surface raiders . . . Let this warning be clear. From now on, if German or Italian vessels of war enter the waters the protection of which is necessary for American defence, they do so at their own peril. The orders which I have given as Commander-in-Chief of the United States Army and Navy are to carry out that policy — at once."

The defendant has paid the face amount of the policy payable upon the death of the insured, and the only question presented is whether the death of the insured was due to a risk included within the double indemnity provision of the policy, or whether the death resulted directly or indi-

rectly from war or any act incident thereto and, therefore, was expressly exempted from the coverage of the policy.

The plaintiff contends that the policy exempts only a death that resulted from a war in which the United States was a participant, and that as this government was not engaged in any war on October 30, 1941, the death of the insured could not have resulted from a war as that term was employed in the policy. The government of the United States had not at that time declared war upon any nation (see 55 U. S. Sts. at Large, cc. 561, 564, 565, passed December 8, 1941, and December 11, 1941, declaring war upon Japan, Germany and Italy), and no nation had then declared war against us. But the existence of a war is not dependent upon a formal declaration of war. Wars are being waged today that began without any declaration of war. The attack by the Japanese on Pearl Harbor on December 7, 1941, is the latest illustration. This is not a modern method, for it has been said that, from out of one hundred eighteen wars that occurred between 1700 and 1872, in hardly ten did formal declarations precede the commencement of hostilities. Phillipson, International Law & The Great War, page 53. But it is not necessary, in the view that we take of this case, to determine from the character of the events that were occurring in the North Atlantic prior to the sinking of the Reuben James, whether any actual state of war existed between the United States and any other nation, because we are of the opinion that the meaning of the term "war" as used in the policy cannot be restricted to one that was being waged by the United States and in which the insured was actively engaged, as the plaintiff contends. We make no intimation, however, that if it were so restricted the plaintiff could prevail.

As in the case of any other contract, the words of an insurance policy, in the absence of ambiguity, must be given their usual and ordinary meaning. The term "war" is not limited, restricted or modified by anything appearing in the policy. It refers to no particular type or kind of war, but applies in general to every situation that ordinary people would commonly regard as war. There is nothing

in the policy that indicates that the word was used in any vague, indefinite or ambiguous sense. A policy of insurance whose provisions are plainly and definitely expressed in appropriate language must be enforced in accordance with its terms. We hold that the clause exempting the defendant from liability where death is caused by war is not restricted in its operation to a death that has resulted from a war being prosecuted by the United States. *Dole* v. *New England Mutual Marine Ins. Co.* 6 Allen, 373. *Rocci* v. *Massachusetts Accident Co.* 222 Mass. 336. *Koshland* v. *Columbia Ins. Co.* 237 Mass. 467. *Mendelsohn* v. *Automobile Ins. Co.* 290 Mass. 228. *Sherman* v. *Metropolitan Life Ins. Co.* 297 Mass. 330. *Estabrook* v. *Eastern Commercial Travelers Accident Association*, 308 Mass. 439.

A conflict between the armed forces of two nations under authority of their respective governments would be commonly regarded as war. *Bas* v. *Tingy*, 4 Dall. 37. *Prize Cases*, 2 Black, 635. *Montoya* v. *United States*, 180 U. S. 261. *Oetjen* v. *Central Leather Co.* 246 U. S. 297. *Hamilton* v. *McClaughry*, 136 Fed. 445. *Gitlow* v. *Kiely*, 44 Fed. (2d) 227. A state of war existed between the United Kingdom and Germany and Italy, as stated in proclamations numbered 2374 and 2407, issued by the President of the United States on November 4, 1939, and June 10, 1940, respectively. These proclamations were public acts of which this court is bound to take judicial notice. *West* v. *New York, New Haven & Hartford Railroad*, 233 Mass. 162. *Scott* v. *Commissioner of Civil Service*, 272 Mass. 237.

The Lease-Lend Act, so called, U. S. C. Title 22, §§ 411–419, which was enacted on March 11, 1941, authorizes the sale, transfer, lease or loan of war materials to the government of any country whose defence the President deems vital to the defence of the United States. The President, in accordance with § 414 (b), was required to transmit to Congress, at least every ninety days, a report of operations under this act. In his first report (Sen. Doc. No. 66, 77th Cong. 1st Sess.), under date of June 10, 1941, the President informed Congress that planes, guns, ammunition, and other defence articles had been and would be supplied in

ever increasing quantities to Britain, China and other democracies resisting aggression; that in June, 1940, the British government had received from our surplus stocks war materials of the value of more than $43,000,000; that the over all total exports to the British Empire had greatly increased in 1941 over 1940; that this nation would help Britain to outstrip the Axis powers in munitions of war and that the United States would see to it that these munitions got to the places where they could be effectively used to weaken and defeat the aggressors. In a second report (Sen. Doc. No. 112, 77th Cong. 1st Sess.), under date of September 11, 1941, the President disclosed that large quantities of gasoline, oil and foodstuffs had been transferred to the British Empire. We take judicial notice of these reports. *Heath* v. *Wallace*, 138 U. S. 573, 584. *Tempel* v. *United States*, 248 U. S. 121, 130. *Arizona* v. *California*, 283 U. S. 423, 454. *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288, 327.

In the light of these reports, the attacks upon shipping in the North Atlantic during the summer and fall of 1941, the damage to two of our destroyers and the sinking of a third by submarines were events that arose out of attempts to stop the flow of war materials and supplies to Great Britain. While the nationality of these submarines is not mentioned in the statement of agreed facts, the conclusion is inescapable that they belonged to a nation at war with Great Britain. Great Britain was then at war with Germany and Italy. The President, on September 11, 1941, had stated that German or Italian vessels of war entered these waters at their peril. The sinking by German or Italian submarines of ships belonging to a belligerent nation, or of ships of another nation conveying war materials and supplies to a belligerent nation, is the usual result of waging war by one nation against another, *Prize Cases*, 2 Black, 635, and the torpedoing of the Reuben James while convoying vessels engaged in such traffic was an act that arose out of the prosecution of such a war. It follows that the death of the insured arose directly or indirectly from war and was not a risk covered by the double indemnity provi-

sions of the policy. *Vanderbilt* v. *Travelers Ins. Co.* 112 Misc. (N. Y.) 248; 235 N. Y. 514. *Letts* v. *Excess Ins. Co.* 32 T. L. R. 361. See *Coxe* v. *Employers' Liability Assurance Corp. Ltd.* [1916] 2 K. B. 629; *Parker* v. *Anderson,* 112 Vt. 371.

> *Exceptions sustained.*
> *Judgment for defendant.*