## GLADYS CHING PANG *v.* SUN LIFE ASSURANCE COMPANY OF CANADA.

### No. 2585.

SUBMITTED JULY 19, 1945.                    DECIDED OCTOBER 24, 1945.

KEMP, C. J., PETERS AND LE BARON, JJ.

OPINION OF THE COURT BY KEMP, C. J.

The defendant company insured the life of Tuck Lee Pang for $1000. His policy carried a double-indemnity clause, giving double the face of the policy for death caused solely by external, violent, and accidental means, but this clause expressly excluded death resulting from riot, insurrection, or war, or any act incident thereto. The assured, an employee of the Honolulu Fire Department, while on duty at Hickam Field on the morning of Decem-

ber 7, 1941, was killed as a result of the Japanese attack on that Sunday morning, which we know as an historical fact commenced at about 7:50 a.m. (Honolulu standard time) and lasted about two hours.

The plaintiff, Gladys Ching Pang, is the beneficiary named in the policy. The defendant company having refused payment of double the face of the policy on the ground that the assured's death resulted from war or an act incident thereto, and therefore came within the exclusion clause, was permitted to make payment of the face of the policy without prejudice, and this suit was instituted by the named beneficiary (assured's wife) to collect the double indemnity.

The trial court sustained defendant's contention, holding that the assured's death was a death resulting from war and that recovery was barred under the exclusion clause. The case is here on exceptions to that decision and the judgment entered pursuant thereto.

The defendant maintains that on December 7, 1941, we were at war with Japan, and that the death of the assured therefore falls squarely within the exclusion clause of the policy, whereas the plaintiff maintains that there must be some recognition, acknowledgment or creation of the existence of war by the political department of the Government —not necessarily by formal declaration—before the courts can or will take judicial notice of its existence, and that there was not such recognition, acknowledgment or creation by the political department of the Government until after four o'clock p. m., Eastern standard time, on December 8, 1941, when the Congress of the United States passed and the President signed the joint resolution declaring war on Japan.

In addition to the facts already recited, the parties stipulated "That on December 8, 1941, a formal declaration of war with Japan was passed by the Congress of the

210

United States," of which the following is a true and correct copy:

"Whereas the Imperial Government of Japan has committed unprovoked acts of war against the Government and the people of the United States of America: Therefore be it

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, that the state of war between the United States and the Imperial Government of Japan which has thus been thrust upon the United States is hereby formally declared; and the President is hereby authorized and directed to employ the entire naval and military forces of the United States and the resources of the Government to carry on war against the Imperial Government of Japan; and, to bring the conflict to a successful termination, all of the resources of the country are hereby pledged by the Congress of the United States." Approved December 8, 1941, 4:10 p. m., E. S. T.

The facts were established by stipulation of the parties and included the foregoing joint resolution and the time of its approval.

The courts take judicial notice of the fact that the foregoing joint resolution was the first act, formal or otherwise, which recognized or acknowledged the existence of war by the political department of our Government. By joining in the stipulation the defendant inferentially admitted that said joint resolution was the first act of the political department of the Government which recognized or acknowledged the existence of a state of war. Otherwise it would have included such earlier action in the stipulation.

The defendant correctly states that the real question before the court is, "were we at war with Japan on December 7, 1941?" The only other question raised by the

exceptions involved the correctness of the court's ruling excluding evidence of the fact that shortly after the attack on Pearl Harbor and Hickam Field the company amended the exclusion clause in its policies thereafter issued by inserting after the word "war" the words "whether declared or not." This evidence was tendered on the theory that it tended to show that the company considered the exclusion clause theretofore used ambiguous and amended it to remove the ambiguity. The court held that the clause in the policy sued on is not ambiguous and rejected the evidence.

We shall first consider the exception to the decision and judgment. If that exception is sustained, it will be unnecessary to consider the exception to the exclusion of the tendered evidence.

Various juridical consequences may flow from the existence of a state of war between two countries. For the purpose of determining when these consequences are produced, it is important to ascertain the date of the beginning and the date of the termination of a war, and it is desirable that these dates be fixed with exactness. Different dates of beginning and termination of a war may be set for different purposes. One date may be taken for the purpose of determining enemy status of a national of a belligerent country, another date for conducting operations against neutral commerce, and still another in the construction of a statute or contract provision. Different dates may also be taken by international courts and municipal courts, for the former may be less influenced by the political action of a single government. (Hudson, *The Duration of War Between the United States and Germany*, 39 Harv. L. Rev. 1020-1021.)

The joint resolution of April 6, 1917, which Congress voted and the President approved at 1:18 p. m. on the same day, declaring war on Germany, is strikingly similar

to the joint resolution of December 8, 1941, which the Congress voted and the President approved, declaring war on Japan. The resolution declaring war on Germany, after a recital that "whereas the Imperial German Government has committed repeated acts of war against the Government and the people of the United States of America," resolved "that the state of war between the United States and the Imperial German Government which has thus been thrust upon the United States is hereby formally declared."

Professor Hudson, in his article in 39 Harvard Law Review, *supra*, discussed and construed the above resolution and reached the conclusion that "a state of war" between the United States and Germany did not exist prior to April 6, 1917.

The pertinent excerpts from his discussion follow: "It cannot be doubted that for all purposes of American municipal law, the state of war existed from the moment of the President's approval of the joint resolution of Congress."

After a discussion of the effect of certain Articles of the Hague Convention not pertinent to our inquiry, the author continued as follows:

"Apart from the Hague Convention, it can hardly be denied that the unilateral declaration by the United States created a state of war with legal consequences. * * *

"It may be concluded, therefore, that both for the purposes of American municipal law and for most, if not all, of the purposes of international law, a state of war between the United States and Germany did begin at some time on April 6, 1917, and continued thereafter. Some question might have been raised, however, as to the possible existence of a state of war prior to that date. The joint resolution of Congress referred to repeated acts of war theretofore committed by Germany 'against the Gov-

ernment and the people of the United States of America,'
and it declared 'a state of war which has thus been thrust
upon the United States.' Was there, then, from a legal
point of view, a pre-existing state of war? Or are these
expressions to be viewed as political characterizations of
certain elements of the situation in which Congress and
the President acted? It was, perhaps, competent for
Congress to give to the declaration of war a retroactive
effect, and it is a question of construction whether that
was done.

"A distinction is commonly drawn between a 'state of
war' and 'acts of war.' In connection with the applica-
tion of Articles 12 and 16 of the Covenant of the League
of Nations, it may become very important to say what is
a 'resort to war' and in 1923, at the time of the Corfu
incident, there was much discussion as to how these va-
rious terms should be used. It seems doubtful whether
acts of war may be committed against a people as dis-
tinguished from acts of war committed against a govern-
ment; the joint resolution refers to both, but it also limits
the state of war declared to 'the United States and the
Imperial German *Government.*' What were Germany's
'repeated acts of war,' and had they created a 'state of
war' prior to April 6, 1917?

"It would seem difficult to say that any 'act of war'
had been committed by Germany against the United States
prior to January 31, 1917. Violations by Germany of
the recognized duties of a belligerent toward a neutral
may have occurred, but the Government of the United
States did not choose at the time to characterize such
violations as acts of war. If it be admitted that such a
course might have been pursued, or that such characteriza-
tion might properly have been made at a later time in
spite of continued diplomatic relations, it would seem
nevertheless, that there is no possible ground for saying

that a state of war existed prior to January 31, 1917, when the German Government announced its intention to wage unlimited submarine warfare in a zone around Great Britain, France and Italy and in the Eastern Mediterranean. Nor did the communication of this intention constitute an act of war, although it led to a rupture of diplomatic relations on February 3, 1917; for on the same day, the President stated in an address to Congress that he refused 'to believe that it is the intention of the German authorities to do in fact what they have warned us they will feel at liberty to do.'

"On April 4, 1917, the Committee on Foreign Affairs submitted a report to the House of Representatives, stating that 'the German Government is actually making war upon the people and the commerce of this country.' It was stated that subsequently to January 31, 1917, 'seven American ships flying the American flag have been sunk and between twenty-five and thirty American lives have been lost as a result of the prosecution of the submarine warfare in accordance with 'the German declaration of January 31. The report continues: 'This is war. War waged by the Imperial German Government upon this country and its people.' But American ships had been sunk prior to January 31, 1917, and it would seem that something more was needed to produce a state of war. * * *

"On the whole, it seems proper to say that a state of war between the United States and Germany did not exist prior to April 6, 1917. The Umpire of the Mixed Claims Commission of the United States and Germany therefore fixed the meaning of the term 'period of belligerency' as used by the Commission to include 'the period between April 6, 1917, and July 2, 1921, both inclusive.' If any criticism is to be made of this, it must be because of the inclusion of the whole of the day of April 6, 1917, in the period of belligerency."

In line with the conclusion reached by Professor Hudson that a state of war between the United States and Ger-. many did not exist prior to the signing of the joint resolution of April 6, 1917, two state supreme courts and one United States District Court have decided that a state of war between the United States and Japan did not exist prior to the signing of the joint resolution of December 8, 1941. They are South Carolina, in *West* v. *Palmetto State Life Ins. Co.*, 202 S. C. 422, 25 S. E. (2d) 475; Idaho, in *Rosenau* v. *Idaho Mut. Ben. Ass'n.*, 145 P. (2d) 227, and *Savage* v. *Sun Life Assur. Co. of Canada,* 57 Fed. Supp. 620. On the whole, it appears that the circumstances of the rupture of peaceful relations between the United States and Germany in 1917 make a stronger case for holding that a "state of war" existed prior to the passage of the joint resolution of April 6, 1917, than do the circumstances of the rupture of peaceful relations between the United States and Japan in 1941 for holding that "a state of war" existed prior to the passage of the joint resolution of December 8, 1941. On January 31, 1917, Germany announced its intention to wage unlimited submarine warfare in a zone of the high seas in which we were exercising our right as a neutral to carry on trade. Some of our ships had already been sunk by German submarines, with loss of American lives and property, as a result of which our Government with the sanction of Congress on February 3, 1917, broke off diplomatic relations with Germany. Thereafter, prior to April 6, 1917, seven other American ships flying the American flag were sunk by German submarines, resulting in further loss of American lives and property.

On December 7, 1941, we not only were maintaining diplomatic relations with Japan but a special Japanese envoy was then in Washington ostensibly for the purpose of patching up the strained relations then existing between

his country and ours, and not until December 8, 1941, did the political department of our Government or the Japanese Government do any act of which judicial notice can be taken creating "a state of war" between the two countries. True, the attack by the Japanese air and naval forces on the morning of December 7, 1941, constituted "an act of war," but an "act of war" and "a state of war" are two different things. An act of war may or may not lead to a state of war.

Counsel for the defendant have criticised the Idaho and South Carolina courts for referring to the Panay incident in the *Rosenau* and *West* cases, *supra*, stating that, "One outstanding fact is common to all these cases. Each case was decided by a court thousands of miles from Pearl Harbor and which had no conception, except by printed reports, of what occurred here on December 7, 1941. This is evident from the language of the decisions (except for the dissent in the *Rosenau* case), since none of them seems to realize what went on here on that date and each of them compares December 7, 1941, with the Panay incident. It is inconceivable that, had these courts any real conception of the December 7 attack, the comparison with the Panay incident would ever have been made." Notwithstanding the criticism of counsel, the sinking of the Panay and the resulting loss of American lives, while differing greatly in magnitude from the attack here on December 7, 1941, was nonetheless "an act of war" from which "a state of war" might well have resulted but for the plea of mistaken identity interposed by the Japanese Government and the payment by it of damages which our Government accepted and refrained from going to war. The criticised courts made it clear that they realized the great difference in the magnitude of the two attacks, and the difference in the attitude of the two governments with reference thereto. Counsel apparently confuse "an act of war" with "a state of war."

The President's message of December 8, 1941, in which he called upon Congress to declare war upon Japan—though not contained in the stipulation of facts—is a public document of which judicial notice may be taken and has been referred to by counsel. In his message the President told the Congress that, "Yesterday, December 7, 1941—a date which will live in infamy—the United States of America was suddenly and deliberately attacked by naval and air forces of the Empire of Japan.

"The United States was at peace with that nation and, at the solicitation of Japan, was still in conversation with its Government and its Emperor looking toward the maintenance of peace in the Pacific. Indeed, 1 hour after Japanese air squadrons had commenced bombing in Oahu, the Japanese Ambassador to the United States and his colleague delivered to the Secretary of State a formal reply to a recent American message. * * *

"Hostilities exist. * * *

"I ask that the Congress declare that, since the unprovoked and dastardly attack by Japan on Sunday, December 7, a state of war has existed between the United States and the Japanese Empire." Congressional Rec. vol. 87, par. 9, pp. 9504-9505.

It was probably within the power of Congress to comply with the request of the President to declare the preexistence of a state of war. The Act declaring war with Spain, passed and approved by the President on April 25, 1898, declared that war be and the same is hereby declared to exist, and that war has existed since April 21, 1898, including said day, between the United States of America and the Kingdom of Spain. (30 Stats. 364) We must therefore construe the joint resolution which the Congress passed in response to the President's message to determine whether or not the Congress did what the President asked it to do.

218

Counsel argues that Congress did exactly what the President asked it to do. The discussion of the joint resolution of 1917 declaring war on Germany would seem to refute this argument.

We shall now notice the cases relied upon by the defendant.

Cases involving civil war, as in the *Prize Cases* (67 U. S. 635) ; cases involving war with Indian tribes (*Montoya* v. *United States*, 180 U. S. 261) ; and cases involving conflict with organizations such as the "Boxer" element in China (*Hamilton* v. *McClaughry*, 136 Fed. 445), relied upon by the defendant, are not helpful in determining the question of when a state of war between two independent sovereigns such as the United States of America and the Empire of Japan began. Those cases are authority for the admitted proposition that no "formal" declaration is necessary to the creation of a "state of war," and that by making payment to the officers and men engaged on a war basis and other informal acts the Congress recognizes the existence of a "condition" of war. (*Hamilton* v. *McClaughry, supra.*) In the *Prize Cases, supra,* page 666, it is said that, "A civil war is never solemnly declared; it becomes such by its accidents (*sic*)—the number, power, and organization of the persons who originate and carry it on. When the party in rebellion occupy and hold in a hostile manner a certain portion of territory; have declared their independence; have cast off their allegience; have organized armies; have commenced hostilities against their former sovereign, the world acknowledges them as belligerents, and the contest a *war.*" But the decision in the Prize Cases recognizes the difference between civil war and national or foreign war in the following excerpt from the decision :

"As a civil war is never publicly proclaimed, *eo nomine* against insurgents, its actual existence is a fact in our

domestic history which the Court is bound to notice and to know.

"The true test of its existence, as found in the writing of the sages of the common law, may be thus summarily stated: 'When the regular course of justice is interrupted by revolt, rebellion, or insurrection, so that the Courts of Justice cannot be kept open, *civil war exists* and hostilities may be prosecuted on the same footing as if those opposing the Government were foreign enemies invading the land.'

"By the Constitution, Congress alone has the power to declare a national or foreign war."

The decision in the *Montoya* case also recognized the difference between war with an Indian tribe and a war between the United States and another civilized nation by the following excerpt therefrom: "While, as between the United States and other civilized nations, an act of Congress is necessary to a formal declaration of war, no such act is necessary to constitute a state of war with an Indian tribe."

And in *Marks* v. *United States*, 161 U. S. 297, at 300-301, in discussing the contention that "war is a political status, and to be determined by the political department of the government, by matter of record, and never by oral testimony," the court quoted the following from *The People* v. *McLeod*, 1 Hill 377, 407: "A state of peace and the continuance of treaties must be presumed by all the courts of justice till the contrary be shown; and this is *presumptio juris et de jure* until the national power of the country in which such courts sit officially declares the contrary" and said: "Without questioning these declarations and decisions as applied to the relations between independent nations, we think they avail but little in the solution of the question here presented. That question is, what limitation did Congress intend by the words 'in amity with the United States,' " used in the Indian Depredation Act of March 3, 1891.

The decision in *Hamilton* v. *McClaughry, supra,* based its conclusion that there existed "a condition of war, within the spirit and intent of the fifty-eighth article of war," at least in part, upon the fact that Congress, in making payment on a war basis to our officers and men engaged in suppressing the "Boxer" uprising, had recognized the existence of a condition of war in the theater where our armed forces were operating.

*Vanderbilt* v. *Travelers' Ins. Co.,* 184 N. Y. S. 54, construed a clause in the policy which provided that, "Nor shall this insurance cover * * * death * * * resulting, directly or indirectly, wholly or partly, from * * * war or riot."

The insured lost his life when a German submarine, acting on instructions of the German Government, sank the British steamer Lusitania on which he was a passenger at a time when a state of war existed between Germany and Great Britain. The Lusitania was subject to call in the war service by Great Britain as an auxiliary cruiser, but at the time of the sinking had not been called but was transporting "various sorts of infantry equipment, fittings and the like," as well as other freight and passengers from New York to Liverpool. The gist of the decision denying recovery on the policy is stated in the syllabus as follows:

"Under a life insurance policy expressly providing that it did not cover death resulting directly or indirectly or wholly or partly from war, the insurer was not liable for the drowning of insured, a passenger, when the British steamer Lusitania was sunk by torpedoes fired from a submarine of the Imperial German government, and which was a part of its naval force, while a state of war existed and was then being waged between that government and the United Kingdom of Great Britain and Ireland, as 'war' is every contention by force between two nations under the authority of their respective governments."

*Stankus* v. *New York Life Ins. Co.*, 312 Mass. 366, 44 N. E. (2d) 687, involved a clause which excluded double indemnity if insurer's death resulted directly or indirectly from war or any act incident thereto. The insured, a member of the crew of the U. S. S. Reuben James, lost his life when the Reuben James was sunk by a German submarine. Held, that "war," as used in the policy, was not restricted to one that was being waged by the United States, and that as the result of proclamations of the President of the United States of the existence of war between the United Kingdom and Germany and Italy, and his reports to Congress under the Lease-Lend Act and armed conflict between naval forces of the United States and submarines of a nation at war with Great Britain, which were attempting to stop the flow of war materials from the United States to Great Britain, death of the insured as the result of the torpedoing of the destroyer on which he was serving arose directly or indirectly from "war" within the meaning of the clause excluding double indemnity liability if insured's death resulted directly or indirectly from war.

The facts of both the *Vanderbilt* case and the *Stankus* case differentiate them from the case at bar and render them of little value.

In *Manufacturers' Accident Indemnity Co.* v. *Dorgan*, 58 Fed. 945, at 954, Circuit Judge Taft, speaking for the court stated that, "It is a well-settled rule in the construction of insurance policies of this character, which the insured accepts for the purpose of covering all accidents, to construe all language used to limit the liability of the company, strongly against the company." The foregoing statement of the rule by Judge Taft was quoted with approval by the circuit court of appeals, ninth circuit, in *Jensma* v. *Sun Life Assur. Co. of Canada*, 64 F. (2d) 457, which in turn is cited with approval in *Rosenau* v. *Idaho Mut. Ben. Ass'n, supra.*

All of the cases upon which the defendant bases its claim that within the meaning of the exclusion clause of the policy we were at war with Japan from the moment of the attack on December 7, 1941, recognize that an armed conflict, to be commonly regarded as war, must be between two nations under authority of their respective governments. See the *Stankus* case, *supra*, strongly relied upon by the defendant to establish its claim that the death of insured resulted from war, where it is said, "A conflict between the armed forces of two nations under authority of their respective governments would be commonly regarded as war."

Applying the foregoing rule of construction to the clause excluding double indemnity, if the death of the insured resulted from war or any act incident thereto, we find it impossible, in the light of said rule and the authorities to which we have referred, to agree with the defendant's contention that the death of the insured resulted from war within the meaning of the exclusion clause of the policy.

The exception to the decision and the judgment is therefore sustained.

*R. T. Yamaguchi* and *K. B. Dawson* for plaintiff-appellant.

*Smith, Wild, Beebe & Cades* for defendant-appellee.