ERVIN W. LANGLAS et ux., appellees, v. IOWA LIFE INSURANCE COMPANY, appellant.

No. 48457.

(Reported in 63 N.W.2d 885)

April 7, 1954.

Stephens, Buckingham & Seitzinger and Lehmann, Hurlburt, Blanchard & Cless, all of Des Moines, for appellant.

Hatter & Hatter, of Marengo, and Don Hise, of Des Moines, for appellees.

THOMPSON, J.—The facts before us are not in dispute. Two policies of insurance upon the life of Ervin W. Langlas, Jr., in the respective amounts of $3000 and $5000 were issued by the defendant-company during the years 1945 and 1949. The plaintiffs were the parents of the insured and were the named beneficiaries in the policies. Attached to each policy, and made a

part of it, was a "Double Indemnity Certificate", which provided the company would pay an additional sum equal to the face amount of the policy if the insured should die "in direct consequence of bodily injuries effected solely through external, violent and accidental means." It was further provided, however, that "this certificate does not cover death resulting directly or indirectly from any of the following causes: * * * military or naval service in time of war; * * * war, riot or insurrection; * * *."

On April 2, 1951, Ervin W. Langlas, Jr., the insured, became a member of the armed forces of the United States, specifically of the United States Marine Corps. On March 25, 1952, while the two policies of life insurance were in full force and effect, the insured was killed during active combat duty as a corporal in the First Marine Division, death resulting from missile wounds in the chest and back.

I. There is but one question for our determination: Was the Korean conflict a "war" within the meaning of the double indemnity certificates of the policies? The answer to this question will determine whether the insured met his death as a result of "military or naval service in time of war" or from "war, riot or insurrection." It should be noted there is no controversy over the face amounts of the policies; the sole question is whether these face amounts should be doubled under the double indemnity clauses, or the company is relieved from such double payment by the exclusionary clauses quoted above.

II. It is elementary that in interpreting written contracts the courts' primary search is for the intent of the parties. Sands v. Iowa Mutual Insurance Co. of De Witt, 244 Iowa 16, 19, 55 N.W.2d 572; Iowa Electric Co. v. Home Insurance Co., 235 Iowa 672, 17 N.W.2d 414.

The principle that when the terms of an insurance contract are ambiguous, equivocal or uncertain so that the intention of the parties cannot be clearly ascertained by the ordinary rules of construction, the doubtful points are to be construed strictly against the insurer and liberally in favor of the insured, is equally well settled. Brush v. Washington National Ins. Co., 230 Iowa 872, 876, 299 N.W. 403, 405; Boles v. Royal Union

Life Ins. Co., 219 Iowa 178, 187, 257 N.W. 386, 390, 96 A. L. R. 1400, and cases cited. This rule is, of course, of importance only if the contract be ambiguous. It is then of much aid in determining the intent of the parties, the final end and aim of all construction and interpretation of contracts.

A second principle auxiliary to the determination of intent is that the language of insurance contracts must be given its common and ordinary meaning and must be construed as popularly understood. We have said: "* * * the words, terms, and provisions of insurance contracts, and particularly clauses limiting or excluding liability on the policy, must be given a practical, reasonable, and fair interpretation. * * * Such words must be given their plain, ordinary, and popular meaning and not peculiar or technical meanings." Eggena v. New York Life Ins. Co., 236 Iowa 262, 265, 18 N.W.2d 530, 531. See also King v. Equitable Life Assur. Soc. of the United States, 232 Iowa 541, 542, 5 N.W.2d 845, 155 A. L. R. 1022; Lamar v. Iowa State Traveling Men's Assn., 216 Iowa 371, 373, 249 N.W. 149, 92 A. L. R. 159; Stankus v. New York Life Ins. Co., 312 Mass. 366, 368, 44 N.E.2d 687, 688.

In the light of the rule last expressed, we must examine the contracts to determine whether the parties made their intent clear, or whether the language used is so ambiguous and uncertain as to bring into play the principle of construction strictly against the insurer and liberally in favor of the insured. In Walters v. Mutual Benefit Health & Accident Assn., 208 Iowa 894, 899, 224 N.W. 494, 496, we said: "* * * if its terms are ambiguous, that construction will be given it which is most favorable to the insured. On the other hand, this rule does not warrant an arbitrary judicial construction. The language of the article in controversy must be taken in its ordinary and usual sense, and must be given such interpretation as was probably in the contemplation of the parties when the policy was issued."

Can we say the phrase "military or naval service in time of war", and the word "war" in the later phrase, "war, riot or insurrection" are, when given their popular and ordinary meanings, still so tainted with ambiguity that there is room for construction in which we must resort to the "strictly against

the insurer, liberally in favor of the insured" rule? The plaintiffs contend there is such uncertainty, and the learned trial court agreed. We arrive at a different conclusion.

III. The difficulty arises from the fact that the Korean conflict, in which Ervin W. Langlas, Jr., met his death, was commenced, so far as the United States was concerned, without a formal declaration of war.

The United States Constitution (Article I, section 8) says that only the Congress may declare war. President Truman sent our armed forces into the fighting in Korea without any action from the Congress. The legislative body was at no time thereafter asked to declare that a state of war existed, nor did it ever formally do so. The plaintiffs contend here that the meaning of the term "war" as used in the double indemnity exclusionary clauses is not clear; that it may have referred only to a war formally declared by the Congress; and so the ambiguity which they think exists should be resolved in their favor and against the defendant.

The contention is one which is not without some plausibility, and it has been adopted by a few courts. We think it basically unsound. The purpose of the insurer in inserting the exclusionary clauses in the double indemnity provisions of the two contracts was to protect itself against the greatly added hazards of an actual war. Danger to the life of its assured, and so liability on the part of the company, would be no less because the chief executive, using his power and authority as Commander in Chief of the armed forces of the United States, committed us to a conflict with other nations without the constitutional sanction of a formal declaration by the Congress. This protection was obviously the motive of the insurer, and must have been apparent to the insured. It made no difference to either party to the contract whether the Congress acted; the executive committed us to a real and bitter war. Nor was this in any sense unusual. Phillipson, in his International Law and The Great War, page 53, points out that of 118 recognized wars occurring between 1700 and 1872, in only ten was there a formal declaration preceding the commencement of hostilities.

In fact, it has long been recognized that the executive may, in many ways, embroil his country in war, so that the

legislature has no opportunity to prevent it and no choice but to accept it as an accomplished fact. Or the war may result from a sudden attack by a hostile nation, requiring immediate retaliation before the Congress has any opportunity to act. With the present possibilities of guided missiles and rapid flight with loads of highly destructive bombs, he is naïve indeed who will say we must wait until a formal declaration is promulgated before we are at war. Adopting the term "war" as it is now commonly understood, and looking to the evident purpose the language in the exclusionary clauses was intended to serve, we must hold the Korean conflict was a "war" within the meaning of the contracts. There is no room for application of the rule contended for by plaintiffs.

The unreality of adopting an interpretation which would hold the Korean struggle not to be a war within any reasonable meaning is pointed up by the fact that as of March 28, 1952 (three days after the insured met his death in the fighting), total United States casualties were 106,956, with 16,739 killed and 77,651 wounded and 9916 missing in action. Of all wars in which this country has been engaged, only the two World Wars and the Civil War exceeded the Korean struggle in cost in casualties and money.

The plaintiffs urge that the insurer could have made the language clearer and more definite by specifying that an "undeclared" war as well as a declared one was meant. Since we think the word "war" is to be understood in its ordinary sense, and further that the popular connotation of the word is by no means limited to wars formally declared by the Congress to be such, we are unable to agree. Many conflicts have been referred to as "wars" when there was no formal declaration. Thus, in the Iowa Code of 1950, section 427.3, paragraph 2, are references to the "war of the rebellion" and "Indian wars." The Philippine Insurrection has been held to be a war within the meaning of an exclusionary clause in an insurance contract. La Rue v. Kansas Mutual Life Ins. Co., 68 Kan. 539, 75 P. 494. Likewise the Civil War, in the Prize Cases (The Amy Warwick) 2 Black (U. S.) 635, 17 L. Ed. 459; and the Boxer Uprising in China, Hamilton v. McClaughry, 10 Cir., Kan., 136

F. 445. The Maine Supreme Court has put it in this pertinent language:

"But every forcible contest between two governments [nations], de facto, or de jure, is war. War is an existing fact, and not a legislative decree. Congress alone may have power to 'declare' it beforehand, and thus cause or commence it. But it may be initiated by other nations, or by traitors; and then it exists, whether there is any 'declaration' of it or not. It may be prosecuted without any declaration; or Congress may, as in the Mexican war, declare its previous existence." Dole v. Merchants Mutual Marine Ins. Co., 51 Maine 465, 470.

In Stankus v. New York Life Ins. Co., supra, page 369 of 312 Mass., page 689 of 44 N.E.2d, the Massachusetts Supreme Court said: "A conflict between the armed forces of two nations under authority of their respective governments would be commonly regarded as war." On page 368 of 312 Mass., page 688 of 44 N.E.2d is this statement: "But the existence of a war is not dependent upon a formal declaration of war." Hostilities on the high seas between naval forces of France and the United States were held to be a "war" although there was no declaration. Bas v. Tingy, 4 Dall. (U. S.) 37, 1 L. Ed. 731. Webster's definition is: "The state or fact of exerting violence or force against another, now only against a state or other politically organized body."

All of the foregoing authorities recognize that war is a fact, not dependent upon the formal declaration of Congress. More than that, they demonstrate the ordinary and common understanding of the term. If armed forces of two nations are in conflict, the ordinary observer knows they are at war; and he is not likely to draw fine distinctions. In common understanding war is war, whether declared or undeclared. Under the general definition of war, the term used in the double indemnity clauses included both declared and undeclared wars, and there was no need for a more particular designation. The whole is greater than any of its parts, and includes all of them.

We have ourselves recognized this principle. In Darnall v. Day, 240 Iowa 665, 37 N.W.2d 277, we were concerned with an agreement on the part of a building owner to make certain

improvements within one year after the close of World War II. More than one year after the close of actual hostilities, but before any official pronouncement of the end of the war, the remodeling had not been done by the landlord, and litigation developed. We held the war had ended within the meaning of the agreement; that it was the close of the fighting which was intended. To the same effect are New York Life Ins. Co. v. Durham, 10 Cir., Utah, 166 F.2d 874, 876, and Stinson v. New York Life Ins. Co., 83 U. S. App. D. C. 115, 167 F.2d 233. Although we have in the case at bar the obverse side of the coin, the same reasoning applies. If it is the common understanding that a war is no longer a war when the shooting is ended, regardless of official pronouncements, we see no reason why the rule should not be applied in reverse. See New York Life Ins. Co. v. Bennion, 10 Cir., Utah, 158 F.2d 260, in which it was held an insured's death in the Japanese attack on Pearl Harbor came as a result of war, although there was no official declaration at the time. As we said in Darnall v. Day, supra, at page 671 of 240 Iowa, page 280 of 37 N.W.2d, "War, in the practical and realistic sense in which it is commonly used, refers to the period of hostilities * * *."

We also pointed out in the Darnall case that the existence of a state of war as determined by the political departments of government is binding upon the courts only in matters of public concern; while as to private contracts the governing principle is the real intent of the parties. New York Life Ins. Co. v. Durham, supra, and Stinson v. New York Life Ins. Co., supra, were cited and followed on this point.

IV. A good case might be made for the contention that although the Congress did not officially declare a state of war to exist, it did for all practical purposes and in substantial effect recognize and ratify its existence. It appropriated billions of dollars for the carrying on of the struggle. It had, on October 6, 1949, enacted the Mutual Defense Assistance Act of 1949, 22 U. S. C. A., section 1571 et seq., providing for military assistance to the Republic of Korea in case of attack. It passed laws giving special postage rates for members of the armed forces in Korea, making them eligible for membership in the American Legion, and authorizing payment of a gratuitous indemnity to

those who died in active service after June 27, 1950, the date of commencement of the Korean fighting. It granted certain veterans' benefits to those in active service after that date, and gave them income tax relief. Reports of its committees repeatedly refer to the "Korean war." There can be no doubt the Congress itself recognized the struggle as a "war." Since we hold there is no ambiguity in the language of the contracts, and the words must be taken in their common meaning, there is no occasion to go further into the question of ratification; but a strong argument might be made for such a holding.

■ V. The case has been argued here by the plaintiffs on the theory that the contracts must be interpreted to mean there is no war unless the Congress of the United States has officially declared it to exist. The possibility of loss of life by the insured in a war in which other nations are involved has not been considered. Yet if we are correct in holding the real purpose of the exclusionary clauses was to protect against the abnormal and excessive risk incurred in war, declared or undeclared, it must appear liability is excluded if the insured engages in any war, even one in which the United States might not be involved. Many American fighting men, in both World Wars, enlisted in the Canadian service before this country was involved. In Korea, the Republic of Korea and many allies, in addition to the armed forces of the United States, members of the United Nations, were fighting the North Korean and Chinese Communist forces. Even if it were possible to say we were never in war in Korea because it was not declared, there was surely a war between many other nations there. In Stankus v. New York Life Ins. Co., supra, the insured lost his life through naval action while serving upon a United States destroyer on convoy duty in the Atlantic, before we entered World War II. The Massachusetts Supreme Court said there was at least a war going on between Great Britain and Germany, and the insured lost his life as an incident thereto.

VI. In addition to Darnall v. Day, which we think directly in point on the question here involved, there are three other Iowa cases involving war risk clauses. In Boatwright v. American Life Ins. Co., 191 Iowa 253, 180 N.W. 321, 11 A. L. R. 1085, and Swanson v. Provident Life Ins. Co., 194 Iowa 7, 188 N.W.

677, the question was whether the membership of the assured in the military or naval forces in itself barred recovery on his policy. They were "status" cases, as distinguished from "result" cases, in which the death must result from some activity peculiar to service. In the Boatwright case it was held the death of the assured from influenza was not connected with his naval service, and recovery was permitted. In the Swanson case, an opposite result was reached, on distinguishing facts. Eggena v. New York Life Ins. Co., supra, the third case, was a "result" case. As in the one we are now considering, the controversy arose over a double indemnity clause. The assured lost his life in a tank training accident, and the dispute arose as to whether his activity was military in its nature. We held it was, as a risk, excluded by the double indemnity clause, and recovery was denied. We said, page 265 of 236 Iowa:

"It is a risk not contemplated in the premium and one for which there can be no actuarial guide in determining premiums. Thus the ordinary insurance company excludes cases of accidental death which occur through war as being too uncertain and the liability probability too large."

This language is cited because it is important in our consideration of the intention of the parties in this class of contracts.

VII. The identical question here involved has been considered by several courts since the outbreak of the fighting in Korea. Of these, only two are courts of last resort, and they have taken opposite positions. The plaintiffs cite and rely much upon Beley v. Pennsylvania Mutual Life Insurance Company and Harding v. Pennsylvania Mutual Life Insurance Company. They were decided by the Supreme Court of Pennsylvania on February 14, 1953, and the opinions are found in 373 Pa. 231, 95 A.2d 202, and 373 Pa. 270, 95 A.2d 221, respectively. The majority and concurring opinions in the Beley case hold to the technical viewpoint, construing the intent of the parties to have contemplated a war declared by the Congress by virtue of its constitutional authority. The cases were decided by a four to two vote of the court, and we agree with the logic and authorities of the dissenting opinions.

The Supreme Court of Texas had the Pennsylvania cases before it when it handed down its opinion on October 7, 1953, in Western Reserve Life Ins. Co. v. Meadows, Tex., 261 S.W.2d 554. The Texas court took what we think the sounder position, holding the Korean conflict to be a "war" within the intent of the insurance contract. Our agreement with the reasoning of the Texas court has already been indicated, and we have cited and followed many of the same authorities.

Other courts not of final authority have had the question before them. In Weissman v. Metropolitan Life Ins. Co., 112 F. Supp. 420, the United States District Court for the Southern District of California refused to follow the Pennsylvania cases, holding there may be war without an official declaration thereof, and that in the absence of any indication the word was used in a technical sense it would be given its ordinary and common meaning. To the same effect is Stanbery v. Aetna Life Ins. Co., 26 N. J. Super. 498, 98 A.2d 134, decided June 29, 1953. Here the Superior Court of New Jersey, while conceding some consideration should be given to the holding of the highest court of the sister state of Pennsylvania, declined to follow it, but agreed with the logic of the dissenting opinions. It is only fair to say there are a few other courts of lower jurisdiction which have followed or agreed with the final determination of the Pennsylvania court. There are also cases holding, in opposition to New York Life Ins. Co. v. Bennion, supra, that the attack on Pearl Harbor on December 7, 1941, was not a war or an act of war. West v. Palmetto State Life Ins. Co., 202 S. C. 422, 25 S.E.2d 475, 145 A. L. R. 1461; Rosenau v. Idaho Mutual Benefit Assn., 65 Idaho 408, 145 P.2d 227; and Savage v. Sun Life Assurance Co. of Canada, D. C. La., 57 F. Supp. 620. The Idaho decision was by a bare majority of the court, with two justices dissenting. So far as these cases are in point, we do not agree with their reasoning and do not find them persuasive.

Our own case of Darnall v. Day, supra, has been widely cited and approved. The reasoning of this case still satisfies us, and we think it controlling, supported as it is by the many authorities above referred to.

VIII. A special concurring opinion in Beley v. Pennsylvania Mutual Life Ins. Co., supra, poses some questions which

have been adopted by the plaintiffs herein, and which should be given attention. It is asked, when did the Korean conflict become a war? How many casualties, 5000 or 10,000, or more, must have been sustained before it would be a war? Who is to determine at what point in time or casualties an undeclared struggle becomes a "war" within the meaning of the terms of insurance contracts excluding liability for deaths as the result of "war"? The method of proving his point used by the learned Pennsylvania justice is not an unusual one; but we do not agree with plaintiffs' counsel that the questions are unanswerable. At least they are not so in the sense that they have any important bearing on the case before us. We are not, in fact, concerned with the answers to the questions posed. What we must know is whether the Korean conflict, as it stood on March 25, 1952, when Ervin W. Langlas, Jr., met his death on the battlefield was a "war" within the commonly understood meaning of the word. If it was such, as we have concluded, we need not go into fine distinctions as to when it became so, nor how many casualties or how much expenditure of blood and treasure made it so. In the words of Justice Smith, in City of Des Moines v. City of West Des Moines, 239 Iowa 1, 14, 30 N.W.2d 500, 507: "There will be time enough to bid the Devil 'good morrow' when we meet him."

We conclude the terms of the double indemnity clauses were clear and unambiguous, and are effective to prevent recovery by the plaintiffs. The case is reversed, with directions to enter judgment for the defendant on each count.—Reversed, with directions.

BLISS, C.J., and MULRONEY, SMITH, GARFIELD, WENNERSTRUM, HAYS, and LARSON, JJ., concur.

OLIVER, J., dissents.