**GAGLIORMELLA et al.**

**v.**

**METROPOLITAN LIFE INS. CO.**

Civ. No. 53-738.

United States District Court,
D. Massachusetts.

June 25, 1954.

Hugh S. Boyd, Newton, Mass., for plaintiffs.

Eugene Lyne, Lyne, Woodworth & Evarts, Boston, Mass., for defendant.

WYZANSKI, District Judge.

This is an action of contract by which plaintiffs seek to recover the additional death benefit payable for death by accidental means, under two policies of life insurance issued by the defendant upon the life of Anthony H. Gagliormella, who designated plaintiffs as his beneficiaries.

It is admitted that the insured died by accidental means, but it is contended that the additional death benefit is not payable because the insured died in the military forces of a "country at war" (to use the language of one of the policies), and as "a result of an act of war" (to use the language of the other policy).

The precise provision of policy number 16 412 317A is that "the company promises to pay * * * an additional sum * * * upon receipt * * * of due proof of violent death of the Insured [if] such death shall not have occurred * * while the Insured is in the military, naval, or air forces of any country at war"; the double payment provision "shall be suspended during any period while the insured is in the military, naval, or air forces of any country at war".

Policy number 17 989 790A provided that "the company promises to pay * * an additional sum * * * upon receipt * * * of due proof of the violent death of the insured (provided) that such death shall not have occurred * * as a result of an act of war."

It is agreed that the insured was a private in the Marine Corps, who "was killed in action against the enemy 31 October 1952 in the Korean Area", and that proof of this fact was submitted by

the beneficiaries in the form of a document officially prepared by the Department of the Navy. Defendant has paid the single indemnity, but refuses to pay the double indemnity benefits. While admitting that death was the result of bodily injuries caused by external, violent, and accidental means, and hence within the normal scope of the double indemnity clauses, it denies any double liability because in its view the insured's death falls within the just quoted war clause exceptions to those clauses.

With respect to policy 16 412 317A, the issue is whether the United States was "at war" in Korea within the meaning of this policy on October 31, 1952.

With regard to policy 17 989 790A the issue is whether the death of the insured occurred "as a result of an act of war".

■ The contracts here in issue were made as a result of applications in this Commonwealth. They insured a Massachusetts citizen. And the parties before me agreed that the Massachusetts state courts would hold that such a contract is governed by Massachusetts state law. Since this case is brought in the Federal Court by virtue of its diversity jurisdiction, this Court must follow the local state rules of conflicts of laws. Therefore, as the parties themselves concede, the two issues in this case are to be determined by the rules of substantive law which would be applied by the local courts of the Commonwealth of Massachusetts.

The Massachusetts courts have not squarely addressed themselves to the issue whether the Korean hostilities constituted a "war" within the meaning of insurance policies. Yet in Stankus v. New York Life Insurance Co., 312 Mass. 366, 368, 44 N.E.2d 687, 688, there is a plain indication favorable to defendant in the instant case. That 1942 decision held that exclusionary clauses such as are in issue at bar precluded double recovery by beneficiaries of an insured American sailor killed at sea in October 1941 by a German torpedo when Germany was at war with the United Kingdom, but not with the United States. Mr. Justice Ronan in Stankus said that as used in insurance policies "the term 'war' * * refers to no particular type or kind of war, but applies in general to every situation that ordinary people would commonly regard as war."

■ With this Massachusetts doctrine in mind, the Korean situation in 1952 can be rapidly sketched. Full details are matters of common knowledge and need no restatement since they have been so well summarized in Beley v. Pennsylvania Mutual Life Insurance Co., 373 Pa. 231, 95 A.2d 202 and Langlas v. Iowa Life Insurance Co., Iowa, 63 N.W.2d 885. But these are the high points. October 6, 1949 Congress authorized the President to furnish military assistance to the Republic of Korea (loosely called South Korea). June 25, 1950 the U. N. Security Council found that North Korean forces had made an unprovoked attack on South Korea. June 27 it recommended that member nations furnish armed assistance; July 7, it recommended that they provide military forces under United States command. By a series of orders, beginning June 27, 1950, the President despatched troops to Korea. Thereafter, Congress with specific reference to the Korean situation made appropriations, caused changes in various veterans and like acts, and imposed taxes. In his testimony before Congress the Secretary of State recognized that "in the usual sense of the word there is a war". [Hrgs. Com. on Armed Services, U. S. Senate, 82nd Cong., 1st Sess. part 3, June 6, 1951, pp. 2013–2014.] Hundreds of thousands of Americans have served in hostilities in Korea. Over 128,000 casualties, including over 22,000 deaths occurred in the American armed forces in Korea.

Nonetheless, neither as of October 31, 1952 nor thereafter, did Congress declare war. And so plaintiffs argue that the policies' exceptions referring to "war" did not come into play. Perhaps, for a

tribunal called upon to apply Massachusetts law an adequate answer lies in Mr. Justice Ronan's canon of construction: was the "situation" one "that ordinary people would commonly regard as war". If the insurance company had agreed to pay double indemnity in case of death by violence in war, would anyone doubt that a military casualty in October 1952 fell within the clause? And the situation is no different where the insurance company limits indemnity in case of death by violence in war. The obvious object of such a reference to war, which any reasonable person would understand, is to treat as exceptional those risks attributable to organized hostilities—not merely those attributable to votes of the Senate and House. Insurer and insured are concerned with bullets, not ballots. And they regard the risks of battles, as different from the risks of brawls. Where the fray has become a far-ranging set of battles it is what they would, and therefore an interpreting court should, regard as a war.

In opposition to this reasoning a double argument is advanced. First, it is contended that the word "war" is ambiguous and could be technically construed according to the American Constitution. And it is argued that where there is ambiguity, a court should adopt against the insurance company, as author of the policy, that construction least favorable to it. Second, it is urged that unless courts take as their standard the existence or absence of a formal declaration of Congress, judges will have no way of knowing when hostilities have reached such size, severity, and substance as to warrant a court in concluding that there is a "war".

These arguments do not seem persuasive.

The so-called ambiguity is the creation of lawyers not laymen. No unsophisticated mind would question whether there was a war in Korea in 1952. None would doubt that the risks were of the type characteristic of a belligerent status. None would doubt that the purpose of the exculpatory clause, whatever it was, applied to this large-scale, organized military expedition. None would doubt that the clause governed regardless of whether war was declared against the United States or by it, or fought by the United States and another country without compliance with international protocol. None would suppose that every time a man was killed in organized hostilities, say in Ethiopia, or Finland, or Indo-China, or Guatemala, the exculpatory clauses turned on whether some aggressive dictator, democracy, or soviet had before beginning battle complied with the formal terms of the constitutive document, if any, of the aggressor state. All such problems would be brushed aside with a common sense view that organized hostilities begun by or against a state are war. And what a layman can see, is not to be looked at with a squint unfriendly to insurance companies in their capacity as authors. "Policies of insurance, like other contracts, must receive a reasonable interpretation consonant with the apparent object and plain intent of the parties. This is entirely consistent with the rule that ambiguities should be construed most strongly against the underwriters, and most favorably to the assured". Insurance Co. v. Boon, 95 U.S. 117, 128, 24 L.Ed. 395; Home Ins. Co. of N. Y. v. Davila, 1 Cir., 212 F.2d 731.

Furthermore, the alleged difficulty that a court would have in determining whether a war existed in the absence of a declaration by Congress seems to me unfounded. Surely it is not more difficult for a court to determine whether the United States is de facto at war than to determine whether a country without a constitution or a formal method of declaring itself is at war. But policies of insurance like the ones at bar, might readily call for such determinations especially in the case of belligerent activities in Africa or Asia to which the United States was not in any way a party. Here the task is simplified for

250

every judge by the fact that the commitments formally made by the President, the Secretary of State, and Congress recognized that the Korean hostilities in 1952 were blown to the full proportions of a war. On this basis, they dealt with foreign nations. They justified conscription. They increased taxation. They enlisted all men to participate in the common defense.

■ The conclusion seems to me inevitable that, (to use the words of policy 16 412 317A,) the insured was killed while in the forces of the United States during a period when the United States was a "country at war".

■ It is even clearer that, (to use the language of policy 17 989 790A) the insured's death occurred "as a result of an act of war". Under this second policy, it would not even be necessary to find that the United States was at war; it would be quite enough to find that either North Korea or South Korea was at war. See Stankus v. New York Life Ins. Co. And those two powers were surely in a belligerent status.

The conclusions which I have reached are supported by Weissman v. Metropolitan Life Insurance Co., D.C.S.D.Cal., 112 F.Supp. 420, 424, 425; Western Reserve Life Insurance Co. v. Meadows, Tex.Civ.App., 256 S.W.2d 674; Stanbery v. Aetna Life Insurance Co., 26 N.J. Super. 498, 98 A.2d 134, 136; Langlas v. Iowa Life Insurance Co., Iowa, 63 N.W. 2d 885. A contrary result has been reached in the careful opinion prepared for a majority of the Pennsylvania court by Chief Justice Horace Stern in Beley v. Pennsylvania Mutual Life Insurance Co. Perhaps the Pennsylvania case can be distinguished because of the precise terms and contrasting provisions of the policy therein considered. If not, I feel constrained to believe that the Massachusetts state court would not accept its holding as a governing precedent.

Judgment for defendant.